MEMORANDUM

GEORGE WASHINGTON UNIVERSITY
FACULTY SENATE DISPUTE RESOLUTION COMMITTEE

SAHA HEARING PANEL

TO:   John Karl and Douglas Mishkin
VIA:  Federal Express

FR:   Joan Schaffner, Chair, Saha Hearing Panel

DA:   July 24, 2006

CC:   Kurt Darr, Chair, GW Dispute Resolution Committee
       Lilian Robinson, Chair, Executive Committee, GW Faculty Senate

RE:   Final Saha Decision
**********************************************************

Enclosed is the final and unanimous decision of the Saha Hearing Panel.

Thank you.



The George Washington University Faculty Dispute Resolution Committee
Debrabata Saha Hearing Panel

*In re* Complaint Against Debrabata Saha
Seeking Tenure Revocation

July 24, 2006

Douglas Mishkin, Washington D.C. for The George Washington University.
John F. Karl Jr., Washington, D.C., for Professor Debrabata Saha.

Before ACHROL, BILES, DUNN, GUTIERREZ, KLOCK, & SCHAFFNER, Panelists.
Decision of the Panel filed by Hearing Panel Chair, JOAN E. SCHAFFNER

JOAN E. SCHAFFNER, Chair:
*******************************************************************

## I. Introduction

This Hearing Panel's (Panel) mandate is to decide whether the George Washington University (University) proved, by clear and convincing evidence, adequate cause for the tenure revocation of Professor Debrabata Saha on two grounds: "persistent neglect of professional responsibilities" and/or "gross personal misconduct that destroys academic usefulness." The Panel held seven hearing sessions between January and April 2006.[1] The parties presented approximately 30 hours of testimony and 190 exhibits. The Panel unanimously finds that (1) the University met its burden on the first ground: Professor Saha has engaged in persistent neglect of professional responsibilities for an extended period and (2) the University failed to meet its burden on ground two: Professor Saha has not engaged in gross personal misconduct that destroys academic usefulness.

## II. A Summary of the Facts

Professor Debrabata Saha was appointed to a faculty position[2] with the University's Department of Engineering and Applied Sciences, signing the appointment letter on June 11, 1986. *Exh. 1*. The letter formed an agreement between Professor Saha and the University, which includes the terms embodied in the Faculty Code and Faculty Handbook. On May 22, 1992, Professor Saha was granted tenure in the Department of Electrical Engineering and

---

[1] The dates of the hearings were: January 30, February 27, March 6, March 20, April 3, April 17, and April 25, 2006.

[2] The appointment was initially a non-tenure-accruing appointment to be converted to a tenure-accruing position upon Professor Saha obtaining permanent resident status.

Computer Sciences. *Exh. 2.* Professor Saha's area of teaching and scholarship is in Communications and Information Theory. *Transcript at 87, 90 (4/3/06).*

The record in this case contains evidence of misconduct or neglect by Professor Saha dating back to 1996 that arose out of a controversy surrounding the February 1996 qualifying examination for the Department's doctoral program in Communications and continues through Spring 2005. Professor Saha has had significant difficulty engaging in academic life with his colleagues within his department, school, and university since 1996. *See e.g. Transcript at 115-18 (4/17/06).* Professor Saha strongly believed that serious flaws occurred in the qualifying examination process and brought complaints to his department chair, dean, and the university administration. During that time passions were high and there existed extreme tension between Professor Saha and the other professors involved in the controversy. *See e.g. Transcript at 54 (4/25/06).* The University conducted an investigation and found that while there existed errors in the examination process, they were not so severe as to warrant further action. *Exh. 25.* Unfortunately Professor Saha refused to accept the result of the investigation. *Transcript at 57-58 (4/27/06).* He was suspended for the Spring 1997 semester, *Exhs. 71, 75*, and reinstated in Fall 1997 with the anticipation that he would rejoin his colleagues as a "fully participating faculty member." *Exh 185.*

Unfortunately this did not transpire. Professor Saha, by his own admission, was unable to communicate with colleagues involved in the 1996 grading incident and avoided them at all cost. *Transcript at 184-85 (4/3/06).* By Fall 1998, a second subcommittee to review Professor Saha's conduct was convened resulting in his suspension for neglect of professional responsibilities for the Spring 1999 semester. *Della Torre Statement ¶ 11; Exh. 99.* However, the University again chose not to revoke Professor Saha's tenure but rather reinstated him pursuant to the April 1999 letter of agreement signed by Vice President Lehman and Professor Saha. *Exh. 107.* The letter expressly enumerated eleven conditions for his continued employment at GW as a tenured faculty member. These conditions were not extraordinary but rather merely reflected the obligations that all GW tenured faculty have to the institution, including : accepting proper lines of authority, meeting with Department Chair and Dean, attending faculty meetings, serving on committees, communicating with colleagues and others within the university, and filing annual reports timely. *Exh. 107.*

This Panel views this letter as a new beginning, an opportunity for Professor Saha to reintegrate into the department and a willingness on the part of the University for Professor Saha to reintegrate. This agreement was a critical juncture as it established the last formal agreement between the parties to put the past incidents behind and move forward in a positive and productive manner. Thus, this Panel bases its decision regarding tenure revocation on Professor Saha's conduct following the April 1999 agreement.

In Fall 1999, the stage appeared set for Professor Saha to reintegrate into the department. Professor Lang was Chair of the Department and had not been involved in the 1996 controversy. In fact, Professor Saha testified that he was comfortable with Professor Lang, *Transcript at 207 (4/3/06),* and that this was a turning point for him, an opportunity to get back on track. *Transcript at 37 (4/17/06).* However, Professor Saha admitted he took no initiative to

reintegrate into the Department. *Transcript at 178-80 (4/17/06)*. He attended two faculty meetings but never attended another. Professor Saha explained that he felt very awkward and uncomfortable in the meetings because of the presence of those individuals who had been involved in the 1996 controversy. *Transcript at 184 (4/17/06)*. When asked if he was harassed or otherwise treated improperly at the meetings he explained no, he just found it difficult to associate with these people in any context. *Transcript at 185 (4/17/06)*. This was the **only** attempt by Professor Saha to comply with his professional responsibilities during Professor Lang's tenure as Chair other than to teach his assigned courses and hold office hours. Professor Saha never attended another faculty meeting, served on no committees of the department or university, submitted no annual reports for the period 1999-00 or 2000-01, and failed to have his students complete evaluations of his courses. *Transcript at 222-24 (4/3/06)*. Moreover, in September 2000 when Dean Timothy Tong assumed the position of Dean of the Department, from outside the University, Professor Saha did not meet with him despite requests by the Dean to do so. *Tong Statement ¶ 3*.

When confronted with these facts, Professor Saha claimed that it was not his fault but rather the University's fault: for not providing him with the forms for student evaluations, *Transcript at 209-10 (4/17/06)*, or informing him that Dean Tong wanted to meet, *Transcript at 23 (4/25/06)*, and Chair Lang's fault for not doing enough to help reintegrate him into the department. *Transcript at 38-40 (4/17/06)*. Furthermore, he claimed he was following President Trachtenberg's guidance from 1996 to avoid all individuals who had been involved in the 1996 controversy. *Transcript at 198 (4/17/06); see also Transcript at 181-81 (4/17/06)*.

The Panel finds these explanations unconvincing. These excuses formed part of a theme reflected throughout these proceedings: Professor Saha testified that he received virtually no communication from the university for the period 1997-2005. *Transcript at 234 (4/3/06)*. Since he refused to use e-mail, *Transcript at 238-39 (4/3/06)*, the only means of communication was through the university mail, regular mail, phone, or in-person. With every document that the university introduced—memoranda and letters addressed to Professor Saha either at work or at home—he claimed not to have received them. *See e.g. Resp. of Professor Saha to Req. for Stipulations ¶ 39-50*. Professor Saha claimed to have difficulty with the phone because "they didn't give me the password [for the voice mail];" although he made little effort to find out what it was. *Transcript at 241-42 (4/3/06)*. As for in-person meetings, he only met with students during his office hours and if any other individual wanted to meet, including his colleagues, they were required to make an appointment. *Transcript at 244-45 (4/3/06)*. However, he testified he never received any requests for appointments and that he, in fact, rarely communicated with his colleagues. *Transcript at 246-49 (4/3/06)*. The Panel finds it implausible that Professor Saha received virtually no communication from the University for a period of eight years. One of the most acute ironies of this case is the utter lack of communication by Professor Saha with his colleagues and his assertion that the university failed to communicate with him, yet he specializes in **Communications.** The Panel finds that Chair Lang acted appropriately in his dealings with Professor Saha, did not prevent him from reintegrating, and in fact encouraged his reintegration.

Finally, regarding President Trachtenberg's statement that Professor Saha should avoid the colleagues involved in the 1996 controversy, it is unimaginable to believe that one can avoid one's colleagues **indefinitely** and remain a productive faculty member. Professor Saha signed the April 1999 agreement that clearly required he communicate with his colleagues, including administrators, and that he follow proper lines of authority. The April 1999 agreement makes no mention of an exception for colleagues involved in the 1996 controversy or of any communication or agreement with President Trachtenberg. Professor Saha testified that he believed Trachtenberg's statement to be incorporated in the April 1999 agreement with Vice President Lehman. However Professor Saha did not mention this to Lehman at the time of their April 1999 agreement, much less include it in the written document. *Transcript at 174-76 (4/3/06)*. Finally, it is particularly interesting that Professor Saha did make a handwritten notation on the April 1999 agreement clarifying that his signature did not constitute admission of any wrongdoing. *Transcript at 186 (4/3/06)*. Surely if he thought to add this language, he would have added the Trachtenberg statement as well. Under no contract principle can the April 1999 agreement between Lehman and Saha incorporate Trachtenberg's statement from 1996. Moreover, it is apparent to the reasonable person that the statement was not intended to relieve Saha from ever communicating again with these colleagues or participating as an active faculty member in his department.

The situation did not improve when Professor Vojcic assumed Chairmanship of the Department in July 2001. Professor Saha continued in his neglect--he attended no faculty meetings, filed no annual reports, served on no committees, submitted no student evaluations, *Transcript at 206-07 (4/17/06)*, refused to communicate directly with Chair Vojcic, *Transcript at 197-98, 202-04 (4/17/06)*, and had little, if any, communication with his colleagues throughout Chair Vojcic's tenure which ended December 2004. *Transcript at 204 (4/3/05)*. During this period there were also isolated instances of difficulties. These instances included creating his own grading sheet rather than using the grades sheets provided by the university (Fall 2001), *Exh. 119*; failure to attend the first class meeting of ECE 244-10 without notice (January 17, 2002) and not meeting with Vojcic to discuss this matter; *Vojcic Statement ¶¶ 16, 22*; and the receipt of two student complaints about his classroom behavior (October 2002). *Exhs. 125, 126*. Professor Saha admitted that he would sometimes use class time to complain about the university administration about issues he found lacking, including the resources and use of the Virginia Campus. *See Transcript at 56-60, 121-24 (4/17/06)*. Admittedly individually each situation is not egregious. Occasionally, students complain about teachers (especially if they fail to do well in their course--as was the case with these two students) or faculty sometimes make comments in class out of frustration with a given situation. But here the sum of these instances, in addition to the complete failure to participate in the department, is problematic. Moreover, Professor Saha admitted that he has not published anything since 1999 although he has been working on research for a book. However, Professor Saha presented no evidence of any progress on this project. *Transcript at 64-70 (4/17/06)*.

Professor Saha was suspended for the third time for two weeks in January 2003 as a result of his neglect. *Exh. 129*. Upon his reinstatement, however, Professor Saha continued his neglect of responsibilities. *Transcript at 222-24 (4/3/06)*. Moreover, in November 2004, Professor Saha distributed an envelope to three administrative assistants in the school containing

Page 4 of 13

three documents–a personal note dated October 14, 2004 regarding former Dean Frieder, *Exh. 136*; a May 1996 letter from Professor Saha addressed to "Dear Colleagues" accusing Professor Zaghoul of lying about him, *Exh. 27*; and a copy of the grade sheet he created in 2001. *Exh. 119*. The note regarding the former Dean contained references to "Academic (!) Mafia Bosses." *Exh. 136*. The receipt of these materials, which contained no explanation from Professor Saha as to the materials' purpose, concerned the assistants. *See Exh. 137*. Although Professor Saha testified that he considered the assistants his friends and wanted to explain to them what had happened over the years, *Transcript at 140-48 (4/17/06)*, a reasonable person would be concerned by the receipt of these materials in a professional setting.

In January 2005, Professor Zaghoul replaced Professor Vojcic as interim Chair for the semester and established another subcommittee of faculty from the department to investigate Professor Saha's conduct since April 1999. *Zaghoul Statement ¶¶ 55, 59, Della Torre Statement ¶ 16, Tong Statement ¶ 9*. The subcommittee was a fact-finding committee to review the record and compile a report of Professor Saha's conduct since April 1999. *Della Torre Statement ¶ 16; Transcript at 114 (3/20/06)*. The subcommittee performed no independent investigation but rather took the files given them by the Chair and compiled a record/report of Professor Saha's conduct. *Transcript at 115-17 (3/20/06)*. The subcommittee did not meet with Professor Saha nor give him an opportunity to comment on the report. *Transcript at 88-89 (3/20/06)*. On May 2, 2005, the Personnel Committee of the department met and voted unanimously that Professor Saha had engaged in persistent neglect of his professional responsibilities and had engaged in gross personal misconduct. *Della Torre Statement ¶ 16, Zaghloul Statement ¶ 60*. On September 16, 2006, Vice President Lehman commenced this proceeding to revoke Professor Saha's tenure. *Lehman Statement ¶ 30*.

### III.  The Principles/Law of this Case

#### A.  Tenure–Essential to the protection of academic freedom

Tenure is a very important and revered institution. Tenure serves two primary purposes: the protection of academic freedom and the provision of economic security. Tenure protects faculty from "arbitrary or retaliatory dismissals based on an administrator's . . . distaste for the content of a professor's teaching or research . . . . It is designed to foster our society's interest in unfettered progress of research and learning by protecting the profession's freedom of inquiry and instruction." *Browzin v. Catholic University*, 527 F.2d 843, 846 (D.C. Cir. 1975). As such, tenure rights are closely protected and are not forfeited easily. The GW Faculty Code (Code), consistent with the principle of protecting tenure, requires a showing of adequate cause by the University by clear and convincing evidence before tenure can be revoked. *See GW Faculty Code, 11 (2004) [hereinafter Code]*. The decision to revoke must be approached with the utmost care and careful consideration otherwise the institution will become meaningless and the academic freedom of faculty will be destroyed. Thus, only egregious instances of neglect and/or misconduct by a faculty member should warrant the revocation of tenure.

In return for the privilege of tenure, faculty are required to meet certain fundamental responsibilities to their students, colleagues, and the institution. These basic responsibilities

Page 5 of 13

generally fall into three categories: teaching, scholarship and service. *See Code, 7, 8.* Each tenured faculty member is required to meet the basic standards of teaching, scholarship, and service in order to enjoy the benefits of tenure otherwise the reputation of the institution is severely tarnished. It is imperative that the public not think that tenure is a license to faculty to sit back and do little, relying on tenure to avoid being held accountable.

### B. Due Process–An opportunity to be heard

Not only is the standard for revocation high, but special procedural protections accompany the revocation of tenure as well. Many employment contracts are at-will, allowing the employer to fire an employee for any reason or no reason at all.[3] However, before tenure may be revoked, the University must demonstrate adequate cause and the faculty member given a reasonable opportunity to respond and defend his or her actions. *Code at 31-33.* The Code binds the university and its faculty. It comprises a significant part of the contractual agreement formed between the university and faculty member at the time of appointment. The Code not only defines the substantive terms for tenure revocation, cited above, but also the procedural terms.

The University and this Panel have complied with these procedural requirements. Vice President Lehman met with Professor Saha in September 2005 and offered to resolve the situation amicably, but Professor Saha found the offer unacceptable. *Transcript at 24 (4/25/06).* On September 16, 2005 this proceeding was commenced by the filing of the complaint signed by the Executive Vice President for Academic Affairs, Donald Lehman and the Dean of the School of Engineering and Applied Sciences, Timothy Tong. The complaint set forth the grounds alleged to constitute adequate cause for dismissal. *Code at 31.* Professor Saha was given adequate time to answer. *Code at 32.* The Hearing Panel was appointed by the Chair of the Dispute Resolution Committee in compliance with the requirements stipulated in Part XIII.F.2(b). Professor Saha was represented by counsel. Professor Saha first argued that the allegations of the complaint did not state with sufficient particularity the basis for tenure revocation. *Fax from John Karl (Dec. 5, 2005).* In response, the Panel requested that the University file a supplemental complaint and that Professor Saha reply. Professor Saha also submitted a lengthy document request on Dec. 5, 2005, which the Panel allowed. *Fax from John Karl (Dec. 5, 2005); Saha Panel Memorandum to Parties (Dec. 7, 2005).*

The Hearing Panel first convened a pre-trial status conference on December 20, 2005, in which questions of pleading, discovery, and timing for the exchange of document and witness lists were addressed. *Saha Panel Memorandum to Parties (Dec. 7, 2005).* Professor Saha was provided the opportunity to request documents and the identity of witnesses from the University and received such information before and during the hearing process. The Panel began the

---

[3] William M. Howard, *Common-Law Retaliatory Discharge of Employee for Disclosing Unlawful Acts or Other Misconduct of Employer or Fellow Employees,* 105 A.L.R.5TH 351 (2003) ("At common law, an employee is generally considered to be employed "at will" and, in the absence of a contract, may be discharged by the employer for any reason whatsoever, or no reason at all.").

evidentiary hearings approximately six weeks later on January 30, 2006 and convened six additional times, ending April 25, 2006. During this period, Professor Saha testified on his own behalf, questioned 16 witnesses, and submitted written testimony of his own. His counsel presented open and closing arguments and a stenographic record was made of the proceedings. Counsel for each party received the hearing transcript after each hearing date. The process met the standard as defined in Part E.4.c(3): an "informal" proceeding that complies "with the requirements of fairness to the parties."

Professor Saha claims that these proceedings were defective because of the use of the supplemental complaint and the denial of full document production. The Panel disputes these contentions. First, as indicated above, the Panel requested that the University file the Supplemental Complaint **at the request of Professor Saha** who claimed the original complaint lacked sufficient particularity. If anything, this benefitted Professor Saha. Second, Professor Saha was entitled to inspect and copy . . . all relevant documents in control of the [University] and not privileged." *Code at 29*. The Panel provided ample opportunity both before the hearings began and during the hearings for Professor Saha to obtain all relevant documents. Moreover, the Panel has the authority to: "exclude matters it deems irrelevant; to place reasonable limits on arguments, the presentation of evidence, and the questioning of witnesses by the parties [and] may decline to consider evidence when its probative value is outweighed by considerations of unfair prejudice, confusion of the issues, undue delay, waste of time, or needless presentation of cumulative evidence." *Code at 28*.

The Panel did deny Professor Saha's last minute interrogatory request filed on April 27, 2006, following the final hearing on the basis that the request was untimely and over broad and that the documents requested were not sufficiently relevant to warrant the delay and expense of compliance. The Panel had granted Professor Saha an opportunity to submit questions to Vice President Lehman who was not available in-person on the last day of hearings, April 25, 2006, to "determine the extent to which they seek to rely on Professor Saha's perceived disability in orchestrating these proceedings." *Letter from John Karl (Apr. 20, 2006)*. The interrogatories, however, went far beyond the scope of Mr. Karl's initial request. Specifically, he requested from the University: "Every tenured faculty member who did not submit an annual report for any of the years from 1999-present" and "Every tenured faculty member who missed a majority of department meetings for any of the years from 1999-present." *Letter from John Karl (Apr. 20, 2006)*. This request was clearly untimely since Professor Saha knew from the filing of the complaint that among the alleged neglect was his failure to attend faculty meetings and file annual reports. It is over broad as it targets any faculty member who has missed filing only ONE annual report or missed a majority of faculty meetings in ONE year. However, the undisputed facts of this case are that Professor Saha missed EVERY faculty meeting from 2000-2005 and failed to file ANY annual reports during this same period. Nevertheless, the University did respond to the two requests that fell within the scope of the original inquiry. *Lehman Statement (May 2, 2006)*. In sum, the Panel provided a fair process by granting Professor Saha more than ample opportunity for discovery and to be heard.

### C. Adequate Cause for Tenure Revocation

Both parties agree that the complaint filed by the University to revoke Professor Saha's tenure sounds in breach of contract. The contract between the University and Professor Saha, as outlined in the Code, provides that only upon a showing of adequate cause, by clear and convincing evidence, may tenure be revoked.

> Adequate cause shall mean unfitness to perform academic duties because of:
> a) incompetence;
> b) lack of scholarly integrity;
> c) persistent neglect of professional responsibilities under this Code; or
> d) gross personal misconduct that destroys academic usefulness.

*Code at 11.*

The University alleges Professor Saha violated parts c and d: specifically that Professor Saha has persistently neglected his professional responsibilities under this Code and has engaged in gross personal misconduct that destroys academic usefulness.

#### 1.  Persistent Neglect of Professional Responsibilities

The phrase "persistent neglect" in the Code/contract, as a matter of law, is "to be given [its] common meaning." *Kakaes v. George Washington Univ.*, 683 A.2d 128, 132 (DC 1996). If ambiguous, terms are to be construed in keeping with the general usage and custom at the University and within the academic community. *McConnell v. Howard University*, 818 F.2d 58, 64 (D.C. Cir 1987). Merriam-Webster's On-Line Dictionary defines "persistent" as "existing for a long or longer than usual time or continuously," and "neglect" as "to give little attention or respect to; to leave undone or unattended to especially through carelessness." A faculty member's responsibility to the University is to provide "professional competence as evidenced by teaching ability, productive scholarship, participation and leadership in professional societies, service to the University, and public service." *Code at 7, 8.* Thus "persistent neglect of professional responsibilities" would require a faculty member to carelessly or willfully disregard their duty to teach, write, and/or participate in service to the university repetitively for an indefinitely long period of time. This threshold is a high one and has two dimensions–breadth and depth. The breadth of one's neglect would involve the number of duties neglected, while the depth would involve the amount of time during which the neglect continued. For example, merely failing to comply with minor administrative duties for a limited period would not suffice to establish adequate cause for tenure revocation–the breadth and depth of neglect must be substantial before tenure is revoked to protect tenured faculty from overly zealous administrators.

This case is an extreme case of neglect of professional duties. The undisputed facts establish that at least from 2000-2005 Professor Saha completely failed to meet all

but one responsibility–the teaching of his classes. Professor Saha provided no service to the University nor participated in academic life. He attended no department meetings, participated on no department, school, or university committee, and submitted no annual reports or student evaluations of his classes. *Transcript at 222-230 (4/3/06)*. His colleagues all testified that they had virtually no contact with him and that, in fact, he avoided contact with them. Moreover, he published nothing during this time. *Transcript at 230-32 (4/3/06)*. Professor Saha explained that he has been working on a book since 1999 but provided no evidence of his progress even when asked by the Panel to produce something. *Transcript at 64-70 (4/17/06)*.

Professor Saha argues that his conduct must be reviewed reasonably in light of the mitigating circumstances,[4] specifically (1) whether Professor Saha acted reasonably in response to the appointment of Professor Vojcic as Chair; (2) whether Professor Saha took reasonable steps to minimize conflict with Professor Vojcic by maintaining a low profile; and (3) whether, under the circumstances, GW's lack of action to rectify the pre-1999 situation excuses some or all of Professor Saha's breach of his contractual obligations.

The Panel finds the answer to each question is "no." The pre-1999 events (specifically the events of 1996-97) obviously affected Professor Saha dramatically and perhaps rightfully so. This Panel does not hold his conduct during that trying time against him. However, a reasonable person must move forward and place the events of the past behind him or her in order to function effectively. Professor Saha failed to do this by his own choice. First, Professor Saha did not participate in the department prior to Professor Vojcic's appointment as chair even though Professor Lang, with whom Professor Saha had a good relationship, was chair. When Professor Vojcic was appointed chair, Professor Saha refused to communicate directly with him. *Transcript at 197-98 (4/17/06)*. This is not a reasonable response. The chair of a department is the first-level administrator, and a faculty member must communicate with his chair to be effective. The Panel rejects Professor Saha's attempt to justify his own failures by casting blame on various individuals who served as his department chair.

Second, Professor Saha did more than maintain a *low* profile, he maintained *no* profile within the department as he was virtually absent from the department when he was not teaching class or in his office for office hours to meet with students only. More importantly however, Professor Saha never explained what conflict he was trying to minimize. There was no evidence presented that Professor Vojcic treated Professor Saha any differently than any other faculty member during his tenure as chair. *Transcript at 197-98 (4/17/06)*.

---

[4]   *See* McConnell v. Howard University, 818 F.2d 58 (D.C. Cir. 1987) (faculty member's tenure revoked for neglect for failure to teach a class after a student calls the professor a "condescending, patronizing racist" and refuses to apologize, explain her continued refusal to speak with him about the incident, or leave the room when requested).

Finally, the evidence clearly demonstrates that GW did take efforts to rectify the pre-1999 situation. Vice President Salaman wrote a lengthy memorandum evaluating the 1996 incident and found that no serious wrong had been done. *Exh. 25.* Moreover, when allegations of plagiarism against Professor Saha were made, the University investigated and determined that they were not supported by the evidence. *Transcript at 74-76 (3/20/06).* Finally, the University entered into an agreement with Professor Saha in April 1999 in an effort to allow him to move forward and reintegrate into the department.[5] In sum, in light of all the circumstances, this Panel finds that Professor Saha acted unreasonably and his continued neglect of most of his professional responsibilities warrants adequate cause for tenure revocation.

Professor Saha argues that the statute of limitations for contract actions is three years and thus any conduct prior to May 2003 cannot form a basis for tenure revocation. This is a rather unusual argument in light of the specific situation here. When the basis for tenure revocation requires **persistent** neglect of duties, it would appear to be in the interest of the faculty member to argue that the university must demonstrate a lengthy neglect of duties–presumably more than three years of neglect. The cases cited by Professor Saha are cases by a faculty member against a university based upon a specific act of a university denying or revoking tenure or promotion.[6] These cases demonstrate that when the alleged breach is a single act of alleged misfeasance, the wronged party must raise the claim within three years. Here, the complaint is by a university against a faculty member and the alleged breach is continuing neglect by the faculty member. Thus, the Panel finds that more than three years of neglect by Professor Saha can be relied upon to support tenure revocation. However, the Panel does agree that returning to the events pre-1999 is inappropriate in this case given the agreement between the parties in April 1999 establishing a "new beginning" for Professor Saha. However, were the Panel limited to a three-year limitations period, Professor Saha neglected his professional responsibilities throughout this period and thus tenure revocation is warranted in any event. Furthermore, Professor Saha's claims that the university failed to rectify pre-1999 events would be untimely under his argument as well. In fact, at no time after 1997 did Professor Saha bring any complaint against the University for any alleged wrongdoing, mistreatment, or neglect.

Finally, Professor Saha argues that the entire process followed by the department in the Spring of 2005 was "rigged" and thus tenure revocation is inappropriate. Specifically, Professor Saha claims that: (1) the University never notified Professor Saha of the Spring 2005 Subcommittee established to review his record nor the Personnel Committee Meeting of May 2, 2005 at which the department's tenured faculty voted

---

[5] *Id.* (university fails to address the slander of a professor by a student during class by transferring the student or assigning the faculty member to a different section even though the university stated its strong disapproval of the behavior by the student).

[6] *See* Kyriakopoulos v. George Washington University, 866 F.2d 438 (D.C. 1989) (failure of university to promote faculty member).

unanimously that Professor Saha's conduct constituted adequate cause for tenure revocation; (2) Professor Saha was not provided an opportunity to present his side of the story to the Subcommittee or the Personnel Committee at the May 2005 meeting; (3) Professors Loew and Vojcic made remarks suggesting they perceived Professor Saha to be disabled at the February 9, 2005 Personnel Committee meeting, (3) Professor Zaghoul, while acting as interim chair for one semester and with animus towards Professor Saha, misrepresented to the faculty present at the May 2005 meeting that Professor Saha was "invited" yet he failed to appear; and (4) the University failed to produce the notes of the May 2005 meeting.

This Panel has spent significant time determining the relevance of these facts. Assuming, without finding, that every fact is true, the Panel finds they are not relevant to these proceedings. It is clear from the Code that the University may file a complaint for tenure revocation without the establishment of a department subcommittee to review the faculty's file or a vote by the department that the conduct establishes grounds for tenure revocation. The Code contemplates that the proceedings of THIS Panel are to be conducted pursuant to the principles of due process. *Code at 31-33*. Professor Saha has been given adequate notice and an opportunity to be heard during these proceedings. This Panel gave no deference to the 2005 Subcommittee's "findings" nor the vote of the faculty at the May 2005 meeting but rather reviewed the evidence presented de novo to determine if the University met its burden of proving by clear and convincing evidence that adequate cause exists for tenure revocation. Thus, procedural defects, if any, in the proceedings of the department in the Spring of 2005 are irrelevant. The Panel seriously doubts that the proceedings were "rigged" or violated Professor Saha's due process rights in any event.[7]

### 2. Gross Personal Misconduct That Destroys Academic Usefulness

The Panel finds that the University failed to demonstrate that Professor Saha engaged in "gross personal misconduct that destroys academic usefulness." Looking to the common definition of these terms, "gross personal misconduct" would refer to intentional or wanton flagrantly offensive and wrongful behavior relating to or affecting

---

[7] For purposes of illustration, let us draw a broad analogy. In the criminal justice system, which involves legal standards far beyond those applicable to our Panel, an individual suspected of a federal crime has few, if any, rights to participate in the criminal investigation or grand jury proceeding. The criminal trial itself offers procedural protections to the accused, including the opportunity to present evidence and to testify personally. While the revocation of tenure is a serious deprivation, it does not rise to the level of a criminal penalty. Our proceedings afforded Professor Saha a generous opportunity to testify and present other evidence. We offer no judgment on the department's deliberations concerning Professor Saha, as they are not relevant under the university's rules to our Panel's work.

a person.[8] The Panel conducted a very brief review of cases invoking "gross personal misconduct" for judicial censure and disqualification for receipt of unemployment benefits after discharge from a job. Examples of gross personal misconduct found by the courts included: unsolicited offensive and embarrassing sexual advances,[9] battering one's wife,[10] lying to a judicial commission,[11] and actions constituting physical or emotional abuse.[12] A judge carrying a loaded gun into the courtroom and leaving it in the wastebasket near the bench during proceedings was not considered gross personal misconduct.[13]

The University presented evidence that Professor Saha withheld student blue books (Spring 1996), *Zaghloul Statement* ¶ 21-26; *Exh. 26, 75*; counseled students not to take a departmental examination (Spring 1996), *Transcript at 54, 82-83 (4/25/06), Exh. 75*; disseminated to students a letter in which he disparaged faculty colleagues (Spring 1996), *Exhs. 27, 28*; threw Professor Loew out of his office after threatening to call the University Police Department (Spring 1996), *Transcript at 29-31 (4/25/06)*; created a grading sheet that violated federal law (Fall 2001), *Exh. 119*; slammed the door on a staff member and student (Spring 2004), *Donohue Statement* ¶¶ 2, 7; and engaged in inappropriate communications with staff including providing three staff members with "memoirs" and other documents relating to eight-year-old events that caused the staff members concern (Spring 2004), *Tong Statement* ¶ 7, *Vojcic Statement* ¶ 26, *Hood Statement* ¶ 15-16, *Swanson Statement* ¶ 6, *Exh. 137.*

This evidence fails to adequately prove gross personal misconduct. First, several of these instances occurred pre-1999, and the Panel believes that conduct prior to the April 1999 should not be used to constitute grounds for tenure revocation in this case. Second, the University failed to prove every act by clear and convincing evidence. Finally, while these actions, taken together, constitute egregious misconduct, the Panel does not find that they rise to the level of **gross personal** misconduct that destroys

---

[8]    Gross– "flagrant or extreme especially in badness or offensiveness: of very blameworthy character;" Personal–"of, relating to, or affecting a person;" and Misconduct–"intentional or wanton wrongful but usually not criminal behavior." Merriam-Webster's Dictionary of Law (1996).

[9]    Matter of Deming, 108 Wash.2d 82 (Wash.1987).

[10]   In the Matter of the Honorable Frank, 564 N.W.2d 785 (Wis. 1997)

[11]   In re Disciplinary Proceedings Against Waddick, 605 N.W.2d 861 (Wis. 2000).

[12]   Lancaster v. Black Mountain Center, 323 S.E.2d 760 (N.C.App.1984).

[13]   Matter of Disciplinary Proceedings Against Breitenbach, 482 N.W.2d 52 (Wis.1992)

Professor Saha's academic usefulness, as the terms have been defined and used in other cases.

### IV. Conclusion

This is the first time in the history of the George Washington University that a hearing Panel has been convened to determine if tenure revocation of a faculty member is warranted. Hopefully, this will be the last. Tenure is a cherished and important institution to the academy and must not be revoked lightly. It is imperative that the administration make every attempt to work with a faculty member before seeking tenure revocation and invoke tenure revocation only in the most egregious circumstances of neglect and/or misconduct.

Unfortunately, this Panel must agree with the University that this case represents such a case of egregious and persistent neglect of professional responsibilities. For more than five years, Professor Saha has failed to engage with his colleagues or the administration. He attended no faculty meetings, served on no committees, submitted no annual reports, submitted no student evaluations, and published nothing. Moreover, he has had virtually no communications with his colleagues. *See e.g. Kyriakopolous Statement ¶ 5, Lang Statement ¶¶ 17, 20, Vojcic Statement ¶ 7, Wasylkiwskyj Statement ¶ 5.* The depth and breadth of his neglect of professional responsibilities cannot be tolerated as it places severe strain on the university administration as well as Professor Saha's fellow colleagues. With the privilege of tenure comes obligation as well and to allow a tenured professor to blatantly disregard the obligations of tenure to this degree severely blemishes the institution of tenure. Moreover, the University has given Professor Saha ample notice of his neglect and several opportunities to correct this neglect over the years without success. In sum, this Panel finds that the University demonstrated by clear and convincing evidence that Professor Saha persistently neglected his professional responsibilities and thus has proven adequate cause for tenure revocation.