UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Professor DEBABRATA SAHA, Ph.D., ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> DONALD LEHMAN, et al. ) <br> ) <br> Defendants. ) <br> ) | C.A. NO. 06-1493 RCL |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

On Monday, August 29, 2005, Defendant The George Washington University (the "University") suspended Plaintiff Debabrata Saha ("Saha") for the fourth time in eight years. Local Rule 56.1 Statement of Undisputed Material Facts No. 1 (hereafter, "Fact No. __"). Saha was a tenured professor in the Department of Electrical and Computer Engineering ("Department") within the School of Engineering and Applied Sciences ("SEAS"). Defendant Donald R. Lehman, Executive Vice President for Academic Affairs, announced the suspension in a letter of that date to Saha:

> I am once again disappointed, but not surprised, by your failure to respond in any way to my letters of June 27 and July 26, 2005 and follow up phone calls, for a meeting, and your failure to attend the meeting I scheduled for August 19, 2005. It is with some regret, but with resolve, that I take the following action:
>
> Effective immediately, and until further notice, you are hereby placed on unpaid suspension. Your classes for the Fall 2005 semester have been reassigned. You are not to come to either campus to teach or perform any University responsibilities. Further, it is my intention in the very near future to initiate proceedings to terminate your tenured appointment, in accordance with Article V.C. of the Faculty Code and Section F of the "Procedures for the Implementation of the Faculty Code."
>
> You may call my office if you wish to discuss this.

Ex. A, Fact No. 2. Mindful that Saha typically denied receiving any written communications from the University,[1] Lehman used the "belt and suspenders" approach in delivering the letter to Saha. He mailed

---

[1] Q: ... is it basically your testimony that you have failed to receive any communications from the University since 1999?

it by regular mail. He mailed it by certified mail. He had a copy placed under the door of Saha's office in the Department. And in a final annoying-but-necessary exercise in redundancy, the University also paid the Quick Messenger Service $31.50 for same-day hand-delivery of the suspension letter to Saha's residence. Fact No. 2 and Ex. B.

When Defendant Timothy Tong, the SEAS Dean, learned on August 29 that the suspension letter was being delivered, he promptly requested that (unarmed) University security officers be present in the front office of the Department where Saha's office was located. Fact No. 3. That same day, Dean Tong also requested that plainclothes security officers be present outside the classrooms of the classes originally assigned to Saha prior to his suspension, because Dean Tong was concerned that Saha might appear for class despite his suspension. Fact No. 3. Dean Tong made these requests to safeguard his staff, to avoid the disruption of SEAS and Department operations, and in response to Department Chair Professor Can Korman's expressed concern for the safety of the Department's faculty and staff. Fact No. 3. Dean Tong was concerned because Saha had a long history of difficult and sometimes aggressive behavior with the SEAS faculty and staff. Fact No. 4. Furthermore, for almost ten years, Saha had consistently failed to communicate with his colleagues, participate in faculty meetings, and respond to the various Chairs of his Department. Fact No. 5. Most striking, Saha had never spoken to Dean Tong, who by this time had been the Dean of SEAS for five years, despite Dean Tong's efforts to communicate with Saha. Fact No. 6.

As feared, on Thursday night, September 1 the suspended Professor Saha appeared in a classroom and began to teach a course entitled ECE-243 – Communications Theory. Fact No. 7. A University security officer, forewarned of just this possibility, advised Saha that he was not allowed to

---

        Saha:    Not '99. I would say '97.

April 3, 2006 Hearing Tr. 234:10-14, App. 10. Saha was an exercise in inaccessibility. Timothy Tong, SEAS Dean, testified during Saha's tenure revocation hearing (infra at 3) that after Saha's August 29, 2005 suspension, when Tong asked Saha how he could communicate with him, Saha "gave me his home address but immediately said that – 'Don't send me anything. It will get lost.' Then I asked for his phone number. He gave me his phone number, and immediately said, 'Don't call me.'" March 6, 2006 Hearing Tr. 439:1-16, App. 5.

2

teach any classes due to his suspension and asked him to leave the classroom. Fact No. 8. Saha left without incident. Fact No. 9. The following morning, Saha appeared in his Department office -- again in violation of his suspension – and again was escorted out by University security officers without incident. Fact Nos. 16, 18.

As stated in Executive Vice President Lehman's August 29, 2005 letter suspending Saha (Ex. A), the University proceeded to file a complaint with the Faculty Dispute Resolution Committee to revoke Saha's tenure for "persistent neglect of professional responsibilities," among other grounds. A hearing panel of seven faculty members heard thirty hours of witness testimony over seven hearing days and reviewed 190 exhibits before deciding unanimously that Saha had engaged in persistent neglect of his professional responsibilities warranting revocation of his tenure. Ex. B to First Am. Compl. Saha filed this lawsuit while challenging that decision before an appeal panel of six other faculty members. He then filed the First Amended Complaint after he lost that appeal but before the University actually revoked his tenure on March 1, 2007.

As set forth below, none of the counts of Saha's First Amended Complaint states a claim. Accordingly, Defendants request that this Court enter summary judgment in their favor against Saha on all counts.

I.  **SAHA HAS FAILED TO STATE A CLAIM FOR FALSE IMPRISONMENT (Count II)**

To establish his claim of false imprisonment, Saha must show that he was unlawfully detained so as to be deprived of his personal liberty or freedom of locomotion. Different cases state these elements with slight variation. See, Edwards v. Okie Dokie, Inc., 473 F. Supp. 2d 31, 44 (D.D.C. 2007)(unlawful detention against one's will within boundaries fixed by defendant); Dent v. May Dep't Stores Co., 459 A.2d 1042, 1044 (D.C. 1982)(unlawful detention of person "whereby he is deprived of his personal liberty or freedom of locomotion"). But the core element of such a claim is clear: "[T]he gist of any complaint for . . . false imprisonment is an unlawful detention." Robinson v. District of Columbia, 2006

3

WL 2714913, *9 (Sept. 22, 2006)(Lamberth, J.), quoting Marshall v. District of Columbia, 391 A.2d 1374, 1380 (D.C. 1978)(quoting Clarke v. District of Columbia, 311 A.2d 508, 511 (D.C. 1973)). Furthermore, a detention is legitimate if the defendant can show that he or she had a good faith belief that its conduct was lawful and that such belief was reasonable. Stebbins v. WMATA, 495 A.2d 741, 743 (D.C. 1985), cited in Saidi v. WMATA, 928 F.Supp. 21, 25 (D.D.C. 1996).

In his claim for false imprisonment, Saha addresses only the events of Thursday night, September 1, when he was asked to leave a classroom. As set forth below, Saha's allegations do not state a claim.

### A.   Saha Was Not Detained

Saha not only fails to allege "the gist" of false imprisonment -- he alleges the opposite. Regarding his removal from the Thursday night class, Saha alleges that

> Defendants caused the false arrest and imprisonment of Professor Saha where he was detained and restrained from teaching his class and was escorted from the class room and then from the building where he was teaching.

First Am. Compl. ¶ 24. Saha's complaint is not that he was required to stay on the premises; it is that he was required to leave. Being "restrained from teaching his class" and being "escorted from the class room and then from the building" is not "imprisonment."

### B.   Saha Had No "Reasonable Apprehension of Present Confinement"

A plaintiff who is not actually detained must, alternatively, show a "reasonable apprehension of present confinement." As the court explained in May Dep't Stores Co., 459 A.2d at 1044, "In determining whether particular conduct constitutes false arrest or imprisonment it is not the subjective state of mind of the plaintiff but, rather, the actions or words of the defendant [which] must at least furnish a basis for a reasonable apprehension of present confinement." [citations omitted]. Similarly, in Tocker v. Great Atl. & Pac. Tea Co., 190 A.2d 822, 824 (D.C. 1963), the court directed a verdict against the plaintiff on the claim of false imprisonment where the officers

> did not use force nor by his actions indicate a threat to do so should she try to leave. She could have walked away at any time and, in fact,

4

> did so at the end of the brief colloquy on the sidewalk without any attempt by the manager, by word or deed, to restrain her. We find no evidence of reasonable apprehension of present confinement by force, or threat or intimation of force by words to imperil her freedom of movement.

Here, as in <u>Tocker</u>, the security officers' treatment of Saha Thursday night did not create a false imprisonment. Saha was not handcuffed. Fact No. 12. Saha was not arrested. Fact No. 13. He was not told that he was under arrest; nor was he threatened with arrest if he refused to cooperate. Fact No. 13. Upon arriving at Room 609 in the Gelman Library where Saha had begun to teach a class, Senior Corporal Francis Williams, Jr. spoke with Saha privately and asked him to leave because he had been suspended three days earlier. Fact No. 8. Saha quietly gathered his belongings and left the classroom without incident. Fact No. 9. Senior Corporal Williams accompanied Saha out of Gelman Library and to the lobby of the Academic Center, where Saha's Departmental office was located. Fact No. 11. Then two junior officers escorted Saha to his office on the sixth floor. Fact No. 11. When Saha and those two officers returned to the lobby, Williams watched from the entrance of the Academic Center as Saha walked to his car parked on the street. Fact No. 11.

The University security officers never touched Saha during this episode, but rather simply walked with him as he left the building. Fact No. 14. Saha cooperated fully with the officers, without getting upset or raising his voice. Fact No. 15. As far as Senior Corporal Williams could tell, "no student or anyone else overheard our conversation." Fact No. 8. As Saha alleges, the security officers simply "escort[ed] [Saha] from the class room and then from the building." First Am. Compl. ¶24. Once out of the building, Saha was free to go where he pleased. Thus, as a matter of law, Saha did not have "a basis for a reasonable apprehension of present confinement."

C.     The University's Security Officers Acted Reasonably And In Good Faith

Even if – despite the above – this Court finds that Saha was somehow detained or had a reasonable apprehension of present confinement, the undisputed facts show as a matter of law that the security officers acted reasonably and in good faith. <u>See, e.g.</u>, <u>Saidi v. WMATA</u>, 928 F. Supp. 21, 25

5

(D.D.C. 1996)(initial detention permissible if based on good faith and reasonable belief crime about to be committed), citing Stebbins v. WMATA, 495 A.2d 741, 743 (D.C. 1985)(security personnel legitimately detained shoplifter based upon good faith, reasonable belief).

The security officers asked Saha to leave the classroom because he had been suspended three days earlier. Executive Vice President Lehman specifically instructed him "not to not to come to either campus to teach or perform any University responsibilities." Ex. A. That suspension and those instructions were the basis of the security officers' good faith belief that Saha was somewhere he was not supposed to be, and their belief was eminently reasonable.

Accordingly, Defendants are entitled to summary judgment on Count II.[2]

## II.   SAHA HAS FAILED TO STATE A CLAIM FOR INVASION OF PRIVACY FOR FALSE LIGHT (Count III)

To state a claim for invasion of privacy for false light, Saha must show (1) publicity (2) about a false statement, representation or imputation (3) understood to be of and concerning Saha, and (4) which places him in a false light that would be highly offensive to a reasonable person. Lohrenz v. Donnelly, 223 F.Supp.2d 25, 40 (D.D.C. 2002)(Lamberth, J.); see also Lane v. Random House, Inc., 985 F.Supp. 141, 148 (D.D.C. 1995)(Lamberth, J.)(citing the Restatement (Second) of Torts § 652E (1977)).[3] Furthermore, a claim for invasion of privacy lies "only if the claimant has suffered an unreasonable and serious interference with protected interests." Jackson v. District of Columbia, 412 A.2d 948, 954 (D.C. 1980). As set forth below, Saha's allegations concerning the events of Thursday evening and Friday morning, September 1 and 2, 2005 fail to state such a claim.

---

[2] Although Saha uses the term "false arrest," he does not allege that he was arrested. He was not. Furthermore, there is no practical distinction between the claims of false arrest and false imprisonment. Dent v. May Dep't Stores Co., 459 A.2d 1042, 1044 n.2 (D.C. 1982); Marshall v. District of Columbia, 391 A.2d 1374, 1380 n.1 (D.C. 1978).

[3] "One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy if, (a) the false light in which the other was placed would be highly offensive to a reasonable person; and (b) the actor had knowledge of or acted in reckless disregard[3] as to the falsity of the publicized matter and the false light in which the other would be placed." Restatement (Second) of Torts § 652E (1977); see also Steinbuck v. Cutler, 2006 WL 3060084, *2 (D.D.C. 2006) ("The District of Columbia Courts have adopted the Second Restatement of Torts' formulation of the law of invasion of privacy.")

A.      There Was No "Publicity"

For a claim of invasion of privacy for false light, "publicity" means that "the matter is made public, by communicating it to the public at large, or to so many persons that *the matter must be regarded as substantially certain to become one of public knowledge*." Steinbuck v. Cutler, 2006 WL 3060084, *2 (D.D.C. 2006)(emphasis in original).[4]  "False light" claims, akin in some respects to defamation claims, generally are brought by persons claiming offense at statements made about them by the media.  Counsel for Defendants has found no reported case in which a plaintiff even asserted, much less succeeded with, a false light claim arising out of being escorted from the workplace.

Saha does not allege that the matter was communicated "to the public at large," and it was not. When the security officers arrived to find Saha teaching in the classroom on Thursday night, September 1, Senior Corporal Williams spoke with him outside of the presence of the students.  Fact No. 8. Williams believes no one overheard any conversation with Saha.  Fact No. 8.  Saha left the classroom and the building at the officers' request, and did so without incident.  Fact No. 9.  At most, only seven students were in the ECE-243 classroom when Senior Corporal Williams asked Saha to leave.  Fact No. 10.  After escorting Saha from Gelman Library to his office in the Academic Center, the officers stayed inside the entryway as Saha got in his car.  Fact No. 11.

Regarding being escorted from his office on Friday morning, September 2, Saha alleges only that he supposedly was seen by an unspecified number of unidentified students, faculty and staff.  First Am. Compl. ¶17.  According to Corporal Felicia Archie, who assisted in escorting Saha out of the Academic Center on Friday, September 2, the sixth floor of the Academic Center was quiet that morning.  Fact No.

---

[4] Under District of Columbia law, "publication," for purposes of liability for defamation, can mean communication to a single person, while "publicity," for purposes of the torts of public disclosure of private facts and false light invasion of privacy, means that the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge. Steinbuck, 2006 WL 3060084 at *2.  "The difference is not one of the means of communication, which may be oral, written or by any other means.  It is one of *a communication that reaches, or is sure to reach, the public.* Id. (citing Restatement (Second) of Torts §652D (emphasis added)).

22. She and her colleague Sergeant Joan Broady accompanied Saha down the elevator to the parking garage; no one else was in the elevator. Fact No. 23.

In sum, Saha has failed to show that being escorted from the Gelman Library on Thursday evening, September 1, 2005 or from the Academic Center on Friday morning, September 2, 2005, were matters that were "substantially certain to become one of public knowledge." For this reason alone, summary judgment on Count II in favor of Defendants against Saha is appropriate.

### B. There Was No "False Statement, Representation or Imputation"

There was no "false statement, representation or imputation" resulting from escorting Saha from the premises either Thursday night or Friday morning. Lohrenz, 223 F.Supp.2d at 40. If escorting Saha off of these premises without handcuffing him, arresting him or touching him actually did imply anything negative, it was only that Saha was not permitted to be there. That implication was true. Saha had been suspended three days earlier. Fact Nos. 1, 2 and Ex. A ("Effective immediately, and until further notice, you are hereby placed on unpaid suspension. Your classes for the Fall 2005 semester have been reassigned. You are not to come to either campus to teach or perform any University responsibilities."). For this reason alone, summary judgment on Count II in favor of Defendants against Saha is appropriate.

### C. There Was No "Highly Offensive" False Light

Even if asking Saha to leave where he was not supposed to be somehow amounts to a false representation, the manner in which he was escorted from the classroom and academic buildings was not highly offensive. It did not cross the line where "there is such a major misrepresentation of [Dr. Saha's] character, history, activities, or beliefs that serious offense may reasonably be expected to be taken by a reasonable man." Random House, Inc., 985 F.Supp. at 149 (Lamberth, J.)(quoting Restatement (Second) of Torts §652E). The "standard is an objective one, based upon the reaction that a reasonable person would have if he or she were the subject" of the alleged misrepresentation. Id. In this case, a

"reasonable person" who had been instructed to stay away (Lehman to Saha: "you are not to come to either campus") could not "reasonably be expected" to take "serious offense" at being asked to leave.

Furthermore, the University escorted Saha from these premises to protect its faculty, students and staff in response to Saha's history of difficult and sometimes aggressive behavior and his colleagues' expressions of concern. Fact No. 4. The University's effort succeeded – Saha departed each time without incident. Public policy supports such an effort. See, e.g., Tynes v. Shoney's Inc., 867 F.Supp. 330, 334 n.4 (D.Md. 1994)("It would be extremely unsound as a matter of public policy to subject the owner of the establishment to civil liability every time the police are called to prevent a conflagration from erupting"). This is particularly true in the employment context, where the termination of an employee may require the removal or barring of that employee from the employer's premises. This is especially so in this case, because the University was concerned about Saha's aggressive behavior in the past. Fact No. 4. As the Court noted in Brown v. Gino Morena Enterp., 44 F.Supp.2d 41, 52 (D.D.C. 1999), several jurisdictions have ruled that an employer's mere removal of an employee from its premises does not state a claim for defamation. See, e.g., Bolton v. Dep't of Human Services, 540 N.W.2d 523, 526 (Minn. 1995)( "[W]here there is no word spoken or conduct other than a simple escorting of the [employee] to the exit door upon his termination, we conclude that as a matter of law [the employee] was not defamed."), Davis v. John Crane, Inc., 633 N.E.2d 929, 938 (Ill. App. 1994)(concluding that an employee's escort off the employer's premises by security guards was reasonably susceptible to innocent interpretation and thus did not constitute defamation), Gay v. William Hill Manor, Inc., 536 A.2d 690, 693 (Md.Ct.Spec.App. 1988)("[T]he mere act of an employer escorting an employee from the building after termination of employment, without more, [does not] constitute a defamatory publication.").

9

### D. Saha Did Not Suffer "An Unreasonable And Serious Interference With Protected Interests"

In <u>Jackson v. District of Columbia</u>, 412 A.2d 948, 954 (D.C. 1980), the court observed that "[a] tort claim for invasion of privacy may be successfully asserted only if the claimant has suffered an unreasonable and serious interference with protected interests." [citation omitted]. In <u>Jackson</u>, the finding that the mistaken arrest of the plaintiff was reasonable and the mistake was unintentional precluded plaintiff's tort claim for invasion of privacy. Here, Saha's suspension justified the security officers' request that he leave the premises on Thursday night and Friday morning, and they acted reasonably in their treatment of him. <u>Supra</u> at 2-3, 5, 7-8. Thus, Saha did not suffer an "unreasonable and serious interference with protected interests."

For this reason, and for the reasons set forth above, summary judgment on Count II in favor of Defendants against Saha is appropriate.

### III. SAHA HAS FAILED TO STATE A CLAIM UNDER § 1983 (Count I)

To state a claim under 42 U.S.C. §1983, Saha must allege both (1) that he was deprived of a right secured by the Constitution or laws of the United States, and (2) that the defendant acted "under color of" the law of a state, territory or the District of Columbia. <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 150 (1970) (cited in <u>Hoai v. Vo</u>, 935 F.2d 308, 312 (D.C. Cir. 1991)). Saha cannot establish the first element, making summary judgment appropriate in favor of Defendants.

As set forth above, Saha has failed to state a claim either for false arrest/false imprisonment or invasion of privacy/false light. <u>Supra</u> at 3-10. As to the claim for false arrest/false imprisonment, the elements of a constitutional claim for false arrest are substantially identical to the elements of a common-law false arrest claim such that the "constitutional claim cannot stand if the common law claim fails for lack of sufficient evidence." <u>Weishapl v. Sowers</u>, 771 A.2d 1014, 1023 (D.C. 2001). Regarding his invasion of privacy/false light claim, where Saha has failed to show "an unreasonable and serious interference with protected interests," <u>Jackson</u>, 412 A.2d at 954, he has neither a constitutional nor a common law tort claim. Since Saha failed to establish that he was deprived of any right secured by the

Constitution or laws of the United States, his §1983 claim fails. Weishapl, 771 A.2d at 1029(§1983 creates liability of state for unlawful conduct of its agents).

IV.     SAHA HAS FAILED TO STATE A CLAIM FOR A DECLARATORY JUDGMENT (Count IV)

As explained above, supra at 3, Count IV was filed before the University revoked Saha's tenure. In this Count, Saha challenges one aspect of the Faculty Hearing Panel's consideration of the University's internal complaint seeking revocation of his tenure. Specifically, Saha requests a declaration that the University "may not rely on time-barred events occurring more than three years ago in making the decision whether to revoke Professor Saha's tenure based on 'persistent neglect of professional responsibilities.'" First Am. Compl. ¶35.

This claim – that the District of Columbia's three-year statute of limitations somehow limited the University in its own internal procedures to considering only three-years' worth of Saha's "persistent neglect of professional responsibilities" before revoking his tenure and his employment – misunderstands the function of a statute of limitation and thus is wrong as a matter of a law. The statute of limitations bars the filing of a lawsuit for breach of contract outside the statutory period. The District of Columbia's three-year statute of limitations on claims for breach of contract is simply inapplicable to a university's internal disciplinary proceedings. D.C. Code §12-301(7)(2001). Kyriakopoulos v. George Washington University, 866 F.2d 438, 442 (D.C.Cir. 1989), cited by Saha (First Am. Compl. ¶32), says plainly that the statute of limitations delimits the time within which a lawsuit may be filed for breach of contract, and says nothing about applying that statute of limitations to a university's disciplinary process.

The tenure revocation proceedings referenced by Saha (First Am. Compl. ¶31) were governed by the University's Faculty Code. Nothing in that Code contains or hints at any "statute of limitations" within which the University must initiate proceedings to terminate a faculty member's employment for persistent neglect, and Saha does not allege that there is any such Code provision. Nothing in the statute of limitations, which was inapplicable to Saha's tenure revocation proceeding, or in the Faculty Code, which did apply to those proceedings, limited the Hearing Panel to considering only three-year old

11

misconduct. Indeed, where the Hearing Panel was charged by the Faculty Code with determining whether Saha had engaged in "persistent neglect of professional responsibilities," it is implicit that "persistent neglect" could require an examination of a prolonged pattern of misconduct extending longer than three years or beyond any particular period of limitations.

Accordingly, summary judgment on Count IV in favor of Defendants against Saha is appropriate.

## CONCLUSION

For the foregoing reasons, Defendants The George Washington University, Donald R. Lehman and Timothy Tong request that this Court enter summary judgment in their favor against Plaintiff Debabrata Saha on all counts, with costs.

                                                                   /s/_____
                                                                   Douglas B. Mishkin, DC Bar # 338590
                                                                   Shannon M. Gibson, DC Bar # 482243
                                                                   PATTON BOGGS LLP
                                                                   2550 M Street, N.W.
                                                                   Washington, D.C. 20037
                                                                   Telephone: (202) 457-6000
                                                                   Facsimile: (202) 457-6315
                                                                   Counsel for Defendants

Dated: August 3, 2007

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 3rd day of August, 2007 a true and correct copy of the foregoing Memorandum of Points and Authorities in Support of Defendants' Motion for Summary Judgment was sent by regular mail, postage prepaid to the following:

>Debabrata Saha
>9409 Fairpine Lane
>Great Falls, VA 22066
>Plaintiff appearing *pro se*

_____
Douglas B. Mishkin