# United States District Court
# For The District of Columbia

--------------------------------------------------------

Debabrata Saha,

      **Plaintiff,**

v.                                                     Civil Action No. 1:06-01493 (RCL)

Donald Lehman, Timothy Tong, and
The George Washington University

      **Defendants**.

--------------------------------------------------------

**Response to and Motion for dismissing Defendants' motion for Summary Judgment, Dated Aug. 3rd, 2007**

The Plaintiff Debabrata Saha hereby moves that the court dismiss Defendants' motion for Summary Judgment, Dated Aug. 3rd, 2007, and requests the Court to enter judgment in favor of Plaintiff and against the Defendants on all counts of Plaintiff's First Amended complaint. The Plaintiff therefore demands judgment against Defendants, jointly and severally, for the amount of $10,000,000 in compensatory damages and $10,000,000 in punitive damages, plus interest, and reasonable costs and fees. Plaintiff further requests the Court to grant such other and further relief as the Court deems appropriate, proper and just.

The grounds for dismissing Defendants' motion for Summary Judgment and the reasons for moving judgment in favor of Plaintiff on all counts of Plaintiff's First Amended complaint are enclosed herewith.

Respectfully submitted,

Debabrata Saha
9409 Fairpine Lane
Great Falls, VA-22066
Ph : (703) 757-5418
e-mail : sbaisakh@cox.net
November 8, 2007

RECEIVED
NOV - 8 2007
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

1

# Page Index : Multiple Documents

**Part  Description**                                                              Pg-Pg

**Main Document**
Response opposing Motion for Summary Judgment                                       1

**Section I**
Response, Arguments, Factual Rebuttal, Disputed Material Facts                      2-28

  Memorandum of points detailing opposition                              3
    1. Plaintiff's Complaint : August 24, 2006; Amended January 5, 2007    3
    2. Answers filed by Defendants : January 25, 2007               4
    3. Defendant's Motion for Summary Judgment : August 3rd, 2007   5
    4. Facts of vengeance that caused harm to the Plaintiff          5
    5. Material Facts in Dispute                                     7
    6. List of  Plaintiff's Affidavits                              25
    7. List of Plaintiff Exhibits                                   26
    8. Conclusions of Response                                      28

**Section II**
Legal Opinions, Court Cases and Analysis                                           29-36
    A. Time Barring                                                 30
    B. Count I : Violation of 42U.S.C.-1983                         31
    C. Count II : False Arrest and Imprisonment                     32
    D. Count III : Invasion of Privacy and False Light              34
    E. Count IV : Declaratory Judgment                              35

**Section III**
Conclusions drawn from Factual Materials & Legal Analysis                          37-44
    Factual Materials                                              38
    Legal Points                                                   41
    Concluding Points                                              44

**Section IV**
Affidavits                                                                         45-85
    Affidavit #1 :    Disputing Felicia Archie                      46
    Affidavit #2 :    Disputing Don Lehman                          50
    Affidavit #3 :    Disputing Sandra Little                       54
    Affidavit #4 :    Disputing Timothy Tong                        55

i

Affidavit #5 :        Disputing Keely Walston                                      59
Affidavit #6:         Disputing Francis Williams                                   60
Affidavit #7 :        On Credibility of Lehman & Mishkin                           63
Affidavit #8 :        On Motives and Behaviors of the Defendants                   67
Affidavit #9 :        On 1996 GWU Qualifying Exam Scandal
                      and Whistle Blowing                                          68
Affidavit #10:        Disputing the wrongful portrayal of the Plaintiff            69
Affidavit #11:        On 1999 Conspiracy by Lehman                                 75
Affidavit #12 :       On procedurally illegitimate Senate Hearing
                      and flawed deliberation of *Schaffner Panel*                 77
Affidavit #13:        On Retaliations by Lehman, Tong, and GWU                     78
Affidavit #14:        On Irregularities in VA Campus as it affected
                      the Plaintiff                                                82
         Certificate of Service (and a notification)                              85


**Section V**
Plaintiff Exhibits                                                            86-382
         List of Exhibits                                                         87
         Exhibit 1 through 55                                                89-382

# I

## Response
## Arguments
## Factual Rebuttal
## Disputed Material Facts

- **GW's Corruption & Whistle Blowing**

- **GW's Character Assassination of Prof. Saha**

- **GW's Ostracism Policy & Retaliation over one decade**

- **Perp Walk, Imprisonment and False Arrest**

- **GW's Cover Up : Flawed Deliberation Chaired by Prof. Schaffner**

- **GW's attempt of financial strangulation of Plaintiff**

- **GW's Vandalism :**

  **(a) Anti American  Activity: Vandalism of  decency, moral &  legal rights of society  that are protected under US constitution**

  **(b)Violation of Civil Rights: which are guaranteed by Federal Laws**

# United States District Court
# For The District of Columbia

-------------------------------------------------

**Debabrata Saha,**

     **Plaintiff,**

v.                                    **Civil Action No. 1:06-01493 (RCL)**

**Donald Lehman, Timothy Tong, and
The George Washington University**

     **Defendants**.

-------------------------------------------------

**Memorandum of points detailing opposition to Defendant's motion of Summary Judgment, Dated Aug. 3rd, 2007**

**Statements of the Case :**

**1. Plaintiff's Complaint : August 24, 2006; Amended January 5, 2007**

Original complaint was filed by Counsel John F. Karl on behalf of the Plaintiff. On July 5, 2007, the Court allowed Plaintiff Debabrata Saha to proceed as pro se. The complaint is against Donald Lehman, Timothy Tong, and The George Washington University alleging

1. Violation of 42 U.S.C., 1983
2. False Arrest and Imprisonment
3. Invasion of Privacy - False Light
4. Improper Attempt of Revocation of Tenure of Plaintiff.

Plaintiff demanded judgment against Defendants, jointly and severally, for $ 10,000,000 in compensatory damages and $ 10,000,000 in punitive damages, plus interest, attorney's fees and costs.

Both parties acknowledged that the controversy is ten years old and the Plaintiff has been suspended four times during that period. The controversy began in 1996 after Professor Saha (Plaintiff) engaged in exposing the GWU Qualifying Exam Scandal; in a one-to-one meeting with Professor Saha, the then GWU President Stephen Joel Trachtenberg labeled that action as Whistle Blowing. GWU, in its history of 185 years (1821-2006) never sought to revoke tenure of any tenured professor.

3

## 2. Answers filed by Defendants : January 25, 2007

Defendant Lehman, Tong, and the George Washington University answered the complaint on January 25, 2007 denying all the charges and requested the Court to enter judgment in favor of Defendants and against Plaintiff with cost.

Prior to filing this answer, the Defendants initiated the process of revocation of Plaintiff's tenure through an internal procedure that is governed by the GW Faculty Code (Plaintiff Exhibit A, Court document filed on Jan.5, 2007). During this GW Senate hearing (Sept.2005-July 2006), the Defendants as well as the faculty panel vigorously insisted on relying only on post April 1999 events for deliberation. The panel deliberation (Plaintiff Exhibit B, Court document filed on Jan.5, 2007) was based on time-barred events; the cut-off date was conveniently chosen as April 30, 1999 (page 2-of-13, Plaintiff Exhibit B). Thus all events, evidence and documents on the following issues were excluded :

*(a) 1996 Whistle Blowing on corruption and favoritism that compromised the integrity of higher learning,*
*(b) 1997 inappropriate Police Action and Escorting Professor Saha out of his classroom, violating his civil rights,*
*(c) Evidence of 1999 conspiracy by Defendant Lehman and Retaliation against Plaintiff through a FALSE charge of Scientific Misconduct, which was later dropped,*
*(d) Perjury on 1999 event that can be easily proven by existing audio tapes at the disposal of Plaintiff, and*
*(e) Other complaints and evidence of harassment, discrimination, and retaliations against Plaintiff.*

Though both parties agreed that **"The Root Cause"** behind the ten year old controversy was the 1996 Qualifying Exam incident, yet the Defendants and the Senate Panel, very selectively, chose to exclude the crucial facts, evidence and documents *by time-barring allowable events.* It is to be noted that **GWU Faculty code doesn't allow such time barring**. Besides, it is just a common sense that in every civilized society, no matter whether it is East or West, North or South, the justice prevails only if we search for the truth and, in this case, the truth is imbedded in **"The Root Cause"**. In the universal notion of justice there is no room for time barring the justice; rather, "justice delayed" is often considered as "justice denied".

Plaintiff's complaint is not isolated from **"The Root Cause"**. Rather it is just one set of demonstration from many sets of vengeful retaliatory events that were carried out by the Defendants over a period of one decade since the whistle blowing. Therefore, the events and evidence that are related to above outlined items (a) through (e) carry weight in supporting Plaintiff's complaint and are essentially relevant for establishing ***Defendants' motives and long term behavioral tendencies***. Any attempt of carrying out justice without

4

visiting **"The Root Cause"** appears like treating a patient with multiple critical illness for his/her secondary symptom only. GW faculty Senate Panel chaired by Professor Joan Schaffner of GWU Law School simply carried out such a hearing which addressed only secondary symptom; Plaintiff Exhibit B is the deliberation of that hearing. This deliberation encouraged the Defendants to bring a motion for Summary Judgment.

### 3. Defendant's Motion for Summary Judgment : August 3rd, 2007

Defendant Lehman, Tong, and The George Washington University brought the motion of summary judgment in favor of Defendants and against Plaintiff Saha on all counts of Plaintiff's First Amended complaint, with costs.

The Defendants used the deliberation of **the procedurally illegitimate** Schaffner Panel to strengthen their motion for summary judgment. Plaintiff, therefore, submits Affidavit # 12 to dispute item IV, p-11, part-2, Motion for Summary Judgment.

### 4. Facts of vengeance that caused harm to the Plaintiff

1. In the beginning of Fall 2005, Defendant Lehman **did not** communicate with Plaintiff Saha.

2. The ECE department of GWU, in the beginning of Fall 2005, through repeated verbal instructions and via instruction through Bulletin Board, deliberately mislead Plaintiff Professor Saha to go to class to teach ECE-243 on Sept 1st evening, 2005.

3. Dean Tong, VP Lehman, and ECE Chair Korman together willfully and maliciously orchestrated a plan of arranging plain clothe and uniformed police officers to humiliate Professor Saha after wrongfully portraying him as violent and aggressive.

4. In their entire motion for Summary Judgment, the Defendants failed to provide a single evidence to substantiate their violent portrayal of Professor Saha. The only evidence they provided is some statements, such as "X expressed concerns to Y about Plaintiff's aggressive behavior" and "Z was really and very sincerely worried about the safety of the faculty and staff members ". Childish playful thoughts of defense indeed!

5. Evidence, without any room for doubt, suggest that the Defendants vengefully orchestrated and carried out the following plan of actions:

(a) taking Prof. Saha out of his classroom against his will after cunningly placing him in the classroom without any prior communication with him about suspension, while

INFORMING and INSTRUCTING the police to escort him out of the class and parade him publicly in a crowded library on Sept.1st, 2007;

(b) while the police officers escorted and paraded Prof. Saha out on Sept. 1st, they did not serve him any bar notice or any instruction for his staying out of the campus;

(c) on Sept. 2nd, without any prior communication or indication, uniformed police officers carried out public humiliation of Prof. Saha once again for about forty minutes in front of his office in the Academic Center which was within the viewing and hearing distance of many faculty members, students, staff and visitors of the ECE department. Then they paraded Prof. Saha out of his office and finally out of the Academic Center.

6. The Defendants admitted that Plaintiff Saha was suspended four times in last one decade since the 1996 GWU Qualifying Exam Scandal. But the Defendants failed to correlate this four suspensions with what the then President Stephen Joel Trachtenberg labeled as Whistle Blowing by the Plaintiff. Defendants failed to point out that Plaintiff Saha, in 1996 and 1997, exposed the Moral Bankruptcy of the George Washington University Administration.

The Defendants also failed to give an account of their Retaliations, Discriminations, and Ostracism over one decade. Since 1996 whistle blowing of GWU's corrupt practices, GWU did not raise the salary of Prof. Saha over one decade.

7. Defendants' plan of humiliating Prof. Saha in Fall of 2005 began in the Spring of 2005 through an attempt of revoking Professor Saha's tenure via a fraudulent process. Refer to Affidavit #12 : on procedurally illegitimate Faculty Senate Hearing and flawed deliberation *of Schaffner Panel*. Also, refer to Affidavit #7: On the Credibility of Defendant Lehman and GW Counsel Douglas Mishkin.

8. The Plaintiff appealed to GWU President Stephen Joel Trachtenberg against the flawed deliberation of faculty hearing, and as result, *Executive Vice President Defendant Lehman recused himself*. President Trachtenberg communicated this development to the Plaintiff. Without any resolution to the Appeal, or any notification of termination of appointment from President Trachtenberg, *the tenure revocation process fell short of completion*, and, currently, GWU Faculty Senate, amongst the opposition of the Defendants, *instituted its Grievance Procedure against Defendant Lehman and the George Washington University*.

9. In the month of September, 2005, after negotiations through several meetings, Lehman agreed to reinstate Plaintiff's salary; that decision was based on Plaintiff's argument that it was unfair for the plaintiff to participate in the senate proceedings without being on salary

while the Defendants would enjoy the luxury of paying hundred of thousands of dollar to their attorneys for their defense. The very core of universal justice should always strive for giving equal advantage, or at least as much as possible, to both Plaintiff and Defendant till the decision is reached. That's why American Legal system allows the provision of Attorney's help for the needy financially disadvantaged ones. Defendant Lehman was then convinced and agreed to pay till the completion of Senate Proceedings. Lehman's Nov. 18, 2005 letter (Plaintiff Exhibit 39) simply reiterated that *Plaintiff Saha would be on paid suspension till further notice*. After seeing the tenure revocation attempt fell short of completion, Lehman Administration resorted to different tunes and ammunitions against the Plaintiff. Among other retaliatory actions, GW stopped Plaintiff's pay cheque effective March 1st, 2007 without any notification. **GW is now actively engaged in financial strangulation of Prof. Saha with the intent to put Saha in extreme financial situation to stop the Grievance Proceedings at the Senate and stop the Legal Proceedings at this Court.**

Beginning Fall of 2005, Defendants acted willfully, wantonly, maliciously, and in reckless disregard of Plaintiff's professional reputation and common decency. Because of highly vengeful and reckless conducts of the Defendants, Plaintiff Saha's civil rights were violated and Plaintiff Saha suffered unjustified humiliation, embarrassments, emotional trauma and damages to his professional reputation. The Defendants essentially engaged in

(a) **Anti American Activity** : Vandalism of decency, moral and legal rights of civilized society which are protected under US constitution,
(b) **Violation of Civil Rights** : which are guaranteed by Federal Laws.

## 5. Material Facts in Dispute

**A.** Plaintiff submit the following Affidavits to dispute the declarations of the Defendants which were filed in support of the material facts presented in the motion for summary judgment. The objective of the following set of affidavits is two fold :

(a) to dispute the material facts presented by the Defendants, and
(b) to request the court to asses the credibility of the Defendants.

Affidavit #1: Disputes Declaration of Felicia Archie, dated 7/31/07
Affidavit #2: Disputes Declaration of Defendant Donald R. Lehman, dated August 1, 2007
Affidavit #3: Disputes Declaration of Sandra Little, dated August 1, 2007
Affidavit #4: Disputes Declaration of Defendant Timothy Tong, dated August 1, 2007
Affidavit #5: Disputes Declaration of Keely Walston, dated 8/2/07

Affidavit #6: Disputes Declaration of Francis Williams Jr., dated 6/2/07

In addition, on the question of credibility of Defendant Lehman and GW Counsel Douglas Mishkin, Plaintiff submits :

Affidavit #7: On the Credibility of Defendant Lehman and GW Counsel Mishkin

**B.** To establish the *"Motives and Behavioral Tendencies of the Defendants"* that are relevant to Plaintiff's Complaint and are in dispute with the material facts presented in the motion for Summary Judgment, Plaintiff submits as Affidavit #8, the Academic Paper : *"Still Teaching is noble in America !"* by Debabrata Saha, The George Washington University, 801 22nd Street, N.W., Washington, D.C. 20052, U.S.A., November 14, 2006. It should noted this evidence is an academic paper written within the guidelines of Academic Freedom and honoring the fact that GWU Faculty Senate Hearing materials constitute public information.

**C.** As supporting documents to dispute the material facts of the Summary Judgment, Plaintiff submits following Affidavits.

Affidavit #9 : On GWU Qualifying Exam Scandal which includes "the 37-page document that was submitted by the Plaintiff to Wooldridge-Ramakar Committee in 1997" and "the set of evidence on the Qualifying Exam Scandal "

Affidavit #10 : Disputes the wrongful portrayal of the Plaintiff as violent

Affidavit #11 : On the 1999 Conspiracy by Defendant Lehman and FALSE charge of Scientific Misconduct against Plaintiff.

Affidavit #12 : on procedurally illegitimate Faculty Senate Hearing and flawed deliberation *of Schaffner Panel*

Affidavit #13 : On Retaliation by Defendants Lehman, Tong and GWU

Affidavit #14 : On Irregularities in VA Campus as it affected the Plaintiff

**D.  Plaintiff's point by point response to Defendants'  Statement of Undisputed Material Facts (Part-6, Summary Judgment Motion) :**

**Item 1 :** Need no response; it is a statement of fact.

**Item 2 :** Dispute the statement in entirety through Affidavit #2, 3, 4, and 5. Defendants did not communicate with the Plaintiff about the suspension. The Defendants

deliberately and maliciously conspired and mislead the Plaintiff to place the Plaintiff in the classroom so that they can carry out their vengeance.

**Item 3 :** Dispute the portrayal of my character. Defendants only admitted their actions, and thereby pleaded guilty for taking direct initiatives in vengeful actions of defamation, humiliation, invasion of privacy, and violation of civil rights the plaintiff is entitled to. Defendants' slanderous conduct in the attempt of portraying the Plaintiff as violent that raised the concerns of safety of staff members constitute character assassination charge against Defendant Lehman, Tong and Chair Korman. Affidavit #2, 4, 10, and 11 are submitted to dispute Defendants' statement and in support of character assassination charge against Defendants Lehman, Tong, Korman and as well as Professor Murray Loew of GWU. Item (8) of Affidavit #10 relates specially to perjury of Murray Loew of GWU. In addition, Affidavit #7 is submitted to question the credibility of GW counsel Douglas Mishkin.

Plaintiff pleaded judgment against Defendants, jointly and severally, for $ 10,000,000 in compensatory damages and $ 10,000,000 in punitive damages, plus interest, attorney's fees and costs. Defendants' admission of direct initiatives that resulted in vengeful humiliation, violation of rights and damages to professional reputation of Plaintiff only strengthens Plaintiff's plea for judgment against Defendants.

**Item 4 :** Dispute. Same as the answer to Item 3.

**Item 5 :** Dispute the statement in entirety through Affidavit #4 and Appendix D, page-30 of the Exhibit "the Academic Paper : *"Still Teaching is noble in America !"* by Debabrata Saha, The George Washington University, 801 22nd Street, N.W., Washington, D.C. 20052, U.S.A., November 14, 2006.

**Item 6 :** Dispute. Same as the answer to Item 5.

**Item 7 :** Need no response; it is a statement of fact.

**Item 8 :** First sentence is a statement of fact. Dispute the second sentence; a few students were sitting within a distance of couple of feet. Besides, the entry of Police Officer(s) inside the classroom while Prof. Saha was delivering lecture already created the false impression and, by the account of GWU, some students admitted they were shaken by the incident and the teacher who took over the class had to comfort and calm them down. Also, as a matter of courtesy to the students, before I was escorted out, I myself took a few moments to explain to them very briefly about the situation and suggested them to follow order of the security officers to maintain order and discipline. The students not only

knew the action of the administration but also were given (a) false impression about the character of Prof. Saha (b) an impression of arrest and imprisonment, because they saw me escorted out of the classroom by a police officer and received by other police officers waiting outside, and (c) restriction in the mobility of Prof. Saha as if Prof. Saha were a terrorist or a murderer.

If I refused to leave (which I did not) claiming my right to freedom and mobility, it was absolutely certain that they would physically restrain my movement, call MPD and get me arrested by MPD with some additional charges against me; there is a history of carrying out such procedure on GWU campus and the student community is well aware of that. Refer to the enclosed handcuffed picture of the student (Plaintiff Exhibit 3). By placing four/five uniformed police officers surrounding my classroom in a crowded library, GWU succeeded in threatening me with ACTUAL arrest and ACTUAL hand cuff situation even without saying so. The picture of handcuffed student demonstrates the alternative plan of GWU, had I refused to cooperate. The student community of GWU knows the style of GWU administrators, they didn't need to overhear.

**Item 9 :** This is a statement of fact and that's the correct portrayal of Prof. Saha. Since 1996 when Prof. Saha exposed the **corruption and collective moral bankruptcy of the George Washington University**, Prof. Saha had been subjected to actions by plain clothe and uniformed Police Officers of GWU many times, in 1997, in 1999, and in 2005. Prof. Saha always remained controlled, rational, and disciplined.

**Item 10 :** Dispute the Statement. It is incorrect in the sense that there were only Five students in the class (Plaintiff Exhibit 10). Use of the phrase **"at most"** is highly objectionable, and it only goes against the moral make up of the George Washington University. By allowing the sense that humiliation, embarrassment, violation of civil rights, violation of decency of the civilized world in front of "at most " seven students is quite acceptable, Defendants Tong and the George Washington University violated the Civil Rights law for the second time, and this time in written words to the Judge of the Court. A legal mind would agree that by using the phrase "at most", the Defendant GWU unequivocally asserted its sense and belief that " Raping a Woman in front of at most couple of watchers is of lesser crime than committing the rape in a crowded market place".

**Item 11** : Dispute the statement in entirety through Affidavit # 6.

**Item 12 :** Dispute with the sense of the Statement. I had the right to be in the classroom, I had the right to continue to lecture that evening because I was not communicated otherwise, I had the right to move freely any where I chose to, I had the right to be portrayed as law abiding peaceful person, I had the right to claim to the professional reputation that I acquired over a period of almost two decades, I had the right to claim all

the civil rights that every law abiding person is entitled to. Had I not complied with the order of Police Officers, it was certain, without any room for doubt, that my hand-cuffed picture would have been available as it is available for the poor student in Plaintiff Exhibit 3. It is Plaintiff Saha who acted sensibly to avoid being handcuffed.

**Item 13 :** Disputes the statement. GWUPD caused the false arrest without using handcuff and restrained Prof. Saha's liberty of movement. In effect, GWUPD arrested Prof. Saha without saying so. See also answers to Item 8 and Item 12.

**Item 14 :** Plaintiff is familiar with the procedure GWUPD usually follows. Plaintiff acted sensibly and cautiously to avoid confrontation that would give GWUPD reasons to touch him and restrain him physically. But if Plaintiff Saha claimed to his rights as described in the answer to Item 12, the situation would change to the plight of the student depicted in Plaintiff Exhibit 3. Therefore, the credit goes to Plaintiff that he preferred peaceful alternative.

**Item 15 :** This is a statement of fact and that's the correct portrayal of Prof. Saha

**Item 16 :** Need no response; it is a statement of fact. The plaintiff claims that he had the right to be in his office on Sept. 2nd, 2005 before he was served Bar Notice on that day.

**Item 17 :** This is a statement of actions by GWU police. The Plaintiff maintains that he had the right to be in his office on Sept 2nd because GWU administration failed to communicate with him about the suspension and barring from the campus. Through the actions admitted by the Defendants, the administration violated plaintiff's rights and acted in a vengeful conspiratory style; Affidavit #1, 2, 4, 10 are submitted in support.

**Item 18 :** This is a statement of fact and that's the correct portrayal of Prof. Saha

**Item 19 :** I dispute that there was no threat of handcuff and arrest. By placing four/five uniformed officers surrounding my office, three of whom surrounded me inside my office for questioning, restraining my movement in getting out of my office, and carrying out the operation RHE (Retaliation, Humiliation, and Embarrassment) over a prolonged period of forty minutes in open hallway, GWU administration left no doubt about its motive. If I refused to leave, it was absolutely certain that they would restrain me physically, call MPD and get me arrested with some additional charges against me; there is a history of carrying out such procedure on GWU campus. Plaintiff Exhibit 3 with handcuffed picture of a student is just one of many such actions.

**Item 20 :** Disputes the statement. GWUPD caused the false arrest without using handcuff. Essentially, GWUPD arrested Prof. Saha by restraining his liberty but without saying so.

See also answers to Item 19 and Item 12. Perhaps, GW administration was not happy with the performance of UPD on the night of Sept.1st; **so the administration made a second attempt to provoke Prof. Saha again on Sept. 2nd, 2005**; the administration certainly failed.

**Item 21 :** This is a statement of fact and need no response.

**Item 22** : Dispute. See Affidavit #1.

**Item 23 :** Dispute the statement; there was a third Police officer,  and another person (female), I believed to be a student or a staff member from another department, who was on the elevator (Ref. Affidavit #1)

**Item 24:** This is a statement of fact and that's the correct portrayal of Prof. Saha.

**Plaintiff Exhibit 3**

- Hatchet Centennial
- Hatchet Alumni

- Blog

  - Hatchet Blog
  - Sports Blog
  - SA Blog
  - Sex Blog

- Podcast

Search...    ➡

Home > Campus News

# GW students arrested while protesting workers' rights

CI Guide
Summer 2007

by Gabriel Okolski

**Issue date:** 4/1/04 **Section:** Campus News

A group of GW students Tuesday called on the University to drop charges against 11 demonstrators who were arrested while trying to occupy the Marvin Center earlier in the week.

In a rally outside Rice Hall, about 30 students also urged GW to increase its employees' salaries and health benefits and join the Workers' Rights Consortium, an oversight group that ensures companies aren't violating labor laws.

"We're here today to support our students and demand that the University drop its charges," said junior Timothy Kaldas as he stood in front of the building that houses the office of GW President Stephen Joel Trachtenberg.

The arrest of nine GW and two Georgetown students and would not deter activists from demonstrating for greater worker compensation, junior Alex Freedman, who was not detained in Monday's protest.

"We will continue to carry out our campaign with an even louder voice," she said.

University officials reached for comment Wednesday afternoon said they were unsure whether GW would agree to drop unlawful entry charges against the students.



Media Credit: Paul Goodman

While the Marvin Center is a public venue, refusing to vacate any piece of University property constitutes unlawful entry, according to the Student Code of Conduct.

At 1 p.m. Monday, students gathered in the Marvin Center Great Hall and set up tents, saying they would occupy the space until the University met their demands. About 45 minutes later, MPD arrested 11 students, including two from Georgetown University, for refusing to comply with GW's order to leave the building.

http://media.www.gwhatchet.com/media/storage/paper332/news/2004/04/01/CampusNews/Gw.Students....    8/15/2007

**E.  Plaintiff's response to Defendants' Memorandum of Points and Authorities (Part-2, Summary Judgment Motion) :**

**Observation 1 :**
Memorandum of Points and Authorities has been signed by GW Counsel Douglas B. Mishkin.

**Response to 1:** The Plaintiff request the court to consider Affidavit #7 of Plaintiff in assessing the credibility of GW Counsel Mishkin.

**Observation 2 :**
This thirteen page arguments, which give reference to twenty some court cases, are based on two primary suppositions :

(a) Defendant Lehman suspended Prof. Saha and Prof. Saha was given the knowledge of suspension so that he (i.e. Plaintiff Saha) could act according to his status of suspension starting from the effective date of August 29, 2005.

(b) Aggressive and Violent behavior of Prof. Saha :
   (1) Defendant Tong's declaration : "Prof. Saha had a long history of difficult and sometimes aggressive behavior with SEAS faculty and staff " Ref. page-2, part-2.
   (2) ECE Chair Korman in Sept. 2nd, 2005 e-mail wrote : "....I need not remind you of his (i.e. Plaintiff Saha's) past violent behavior towards ECE faculty and staff." Ref. Affidavit #10.

Response to 2(a):

   Plaintiff Saha submits Affidavit 2, 3, 4, and 5 opposing supposition 2(a) and in support of the following facts of claim :
   Defendant Lehman did not communicate with Prof. Saha about the suspension in any timely manner so that Prof. Saha could act according to his status of suspension starting from the effective date of August 29, 2005. The Defendants deliberately and maliciously conspired against the plaintiff and mislead the Plaintiff to place the Plaintiff in the classroom so that they can carry out their vengeance and humiliate Plaintiff Prof. Saha in a shaming way.

   Plaintiff asserts that upon request of the court, evidence will be produced to establish the fact that Lehman administration (i) often PLAY with the date of creation of record, and (ii) foul play in timely delivery of important letters. In addition, Plaintiff will

14

provide evidence to show the court that GWU Counsel Mishkin has the quality of falsifying documents.

Response to 2(b):

Defendants' **slanderous** attempt of portraying Prof. Saha as violent that raised the concerns of safety  of staff members constitute **character assassination of Plaintiff.** Affidavit #2, 4, 10, and 11 are submitted to dispute Defendants' statements and in support of character assassination charge against Defendants **Lehman, Tong, Korman and Professor Murray Loew** of GWU. Item (8) of Affidavit #10 relates specially to perjury of Murray Loew.

Defendants' admission of direct initiatives that resulted in vengeful humiliation, emotional trauma, violation of rights and damages to professional reputation of Plaintiff only strengthens Plaintiff's plea for judgment against Defendants. Plaintiff pleaded judgment against Defendants, jointly and severally, for $ 10,000,000 in compensatory damages and $ 10,000,000 in punitive damages, plus interest, attorney's fees and costs.

**Observation 3 :**

GW Counsel Mishkin, in second paragraph of page-3, wrote : "........the University actually revoked his (i.e. Plaintiff's) tenure on March 1, 2007."

Response to 3:

The Plaintiff appealed to GWU President Stephen Joel Trachtenberg against the flawed deliberation of faculty hearing, and as result, *Executive Vice President Defendant Lehman recused himself.* President Trachtenberg communicated this development to the Plaintiff through his Memorandum dated December 27 and  letter dated December 28, 2006 (Plaintiff Exhibit 39). Without any resolution to the Appeal, or any notification of termination of appointment from President Trachtenberg, *the tenure revocation process fell short of completion*, and, currently in Fall 2007, GWU Faculty Senate, against the opposition of GW Counsel Mishkin, *instituted its Grievance Procedure against Defendant Lehman and the George Washington University.* Plaintiff Exhibit 53 and 55 directly contradict Mishkin's claim of tenure being revoked (in Observation 3). Mishkin's credibility and honesty are in doubt.

Professor Saha also submits Affidavit #12 to dispute the procedurally illegitimate Faculty Senate Hearing and its flawed deliberation which the Defendants used to strengthen their motion for Summary Judgment. The court should make a note that GWU, so far, failed to respond to the Academic paper entitled : *"A Compelling Account : Flawed Deliberation of Schaffner Panel"* (part of Affidavit #12) which was made available to GWU in December, 2006.

# Response to Defendants' viewpoints on four counts

## Count I : Violation of 42U.S.C.-1983

1. The Defendant failed to establish that I (Plaintiff Saha) was served the notice of Suspension on or before evening of Sept. 1st, 2005

2. On the contrary, GWU, through repeated verbal instructions and instruction through ECE Bulletin Board, instructed me to go to classroom Gelman-609 on Sept. 1st, 2005 to teach ECE-243 scheduled at 7:10pm.

3. Under the law of District of Columbia, GWU's police officers are "stateactors" for the purposes of 42 U.S.C.-1983.

4. After ten minutes into the lecture, four/five uniformed GWU police officers or "stateactors" appeared in front of my class and one of them instructed me to stop the lecture and leave. After I questioned "Why?", I was told that I was suspended by the authority.

5. A uniformed special police officer, Francis Williams Jr. escorted me out of the classroom where I was received and surrounded by three/four other uniformed officers. All of GWU special police officers paraded me down the hallway to the elevator and brought me down to crowded lobby of Gelman Library, and then paraded me out of the building.

6. I went to my department to check my mailbox to see if there was any confirmation of the alleged suspension. But there was no communication related to suspension in the mailbox.

7. I checked the Department's Bulletin Board. The information on the board confirmed that I was assigned to teach Communication Theory course from which I was just removed by GWU's special police officers.

8. Defendants never warned me before this class that they intended to suspend me from teaching duties, to have me arrested in front of my students, or I would be paraded out of the crowded library by GWU's special police.

9. On Sept. 1st, 2005 evening
- when I was arrested by GWU police officers in front of the students, I was in the classroom where I was authorized to be.

16

- I had the right to be in the classroom GEL-609.
- I had the right to continue delivering my lecture.
- I had the right to move freely anywhere inside my classroom, and move freely any where I chose to outside the classroom and in the Campus.
- I had the right to be portrayed as nothing but a law abiding peaceful person both inside in front of my students, and outside the classroom in the hallway and the crowded lobby of the library (being seen surrounded by and imprisoned under the authority of four/five uniformed police officers, and paraded out of a crowded library by the police officers resulted in a criminal like image and an impression of me that is not true but harmful to the reputation)
- I had the right to the professional reputation that I established over two decades since I joined the GW community in 1986.

By arresting me in front of  students without any prior warning and parading me publicly by uniformed police officers, the Defendants, under color of statute, ordinance, regulation, custom, or usage of the District of Columbia deprived me my rights, privileges, or immunities secured by the Constitution and laws of the District of Columbia and the United States. Defendants acted intentionally, or with reckless disregard, in violating my clearly established rights.

As a direct and proximate consequence of Defendant's actions, I suffered emotional distress, damages to my reputation, embarrassment and humiliation. Defendants acted willfully, wantonly, maliciously, and in reckless disregard of my rights and reputation, thereby making themselves liable for punitive damages as claimed in the first amended complaint.

## Count II : False Arrest and Imprisonment

## Sept. 1st, 2005 Incident :

1. On Sept. 1st, 2005 evening I was in the classroom where I was authorized to be and I was arrested in front of the students under a false pretext of suspension. It was a false pretext because the notice of suspension was not SERVED, irrespective of when it was written and how it was transmitted, or whether it was transmitted at all.

2. The alleged August 29, 2005 suspension was not communicated to me; rather on August 29 and August 30, verbally and through information on ECE Bulletin Board, I was advised about my responsibility of teaching ECE-243 on Sept. 1st evening.

3. On Sept. 1st, 2005 evening I was arrested and removed from my classroom GEL-609 against my will. My right to be in the classroom during 7:10pm-8:40pm was forcibly taken away. My right to freedom of movement inside the classroom after uniformed police officers entered my classroom while I was delivering lecture was restricted. My right to freedom of movement outside the classroom in the hallway, in the elevator, and in the lobby of Gelman library was taken away by GWU's uniformed police officers. I was imprisoned within the walls of surroundings of uniformed special police officers of GWU till I was escorted out of the Library.

4. Any reasonable person wouldn't willingly prolong his/her imprisonment. If I chose not to follow the orders of the police officers, the police officers would continue to imprison me within the walls of their surroundings and restrain my movement, then call MPD and get me handcuffed and transfer to police station as the student is pictured in the Plaintiff Exhibit 3; there is a history of carrying out such procedure on GWU campus.

5. By acting sensibly I reduced my imprisonment and prevented further humiliation of being handcuffed with some additional charges against me.

## Sept. 2nd, 2005 Incident :

6. On Sept. 2nd, 2005 morning I was in my office in the Academic Center where I was authorized to be in.

7. On that morning I found a sealed envelope on my table. I called the Chairman's office and decided to open the envelope in presence of Chair Korman . So I was waiting in my office for Chairman and I had the authority to do so.

8. While waiting in the office for Chair Korman to arrive, a Special Police Officer Arron M. Morningstar entered my office with two other lady officers. Officer Morningstar served me a Bar Notice that prohibited me from being on campus, took away my office key, noted down some personal information and handed over a handwritten note suggesting that I contact Vice President Lehman and Dean Tong. As far as I could see, there was another police officer at the doorside in the hallway who engaged in conversation and interrogation with me while standing outside in the hallway. The whole encounter of imprisonment, which I prefer calling Operation RHE (Retaliation, Humiliation, and Embarrassment) went over a prolonged period of forty minutes in open hallway with open doors and in the viewing and hearing distance of students, faculty, staff and visitors to the front of the department. By placing four/five uniformed officers surrounding my office, three of whom surrounded me inside my office for questioning and restraining my movement inside my office, GWU administration left no doubt about its motive. If I

refused to leave, it was absolutely certain that they would restrain me physically, call MPD and get me arrested by MPD with some additional charges against me; there is a history of carrying out such procedure on GWU campus. Plaintiff Exhibit 3 with handcuffed picture of a student is just one of many such actions. The police officers then paraded me in the hallway and escorted me out of the building.

## Follow-up of Sept. 2nd Event : Event of Relevance and Motive

After carrying out Operation RHE on Sept 2nd and barring me from the Campus, Vice President Lehman got into arm twisting negotiation mode. In one of my meetings with him in the month of September, 2005, Lehman pressured me to achieve an objective that he failed to achieve since 1997 when he took the office. With a determined but low voice he said to me:

*"You have to drop the charges about the exam ( The infamous Qualifying Exam Scandal of 1996)"*

The short script and the determination in Lehman's voice reminded Prof. Saha **Marlo Brando in "God Father"; but Brando's style, voice and delivery was much superior.**

Without any second thought, immediately I refused to drop the charges of corruption and favoritism that led to what President Trachtenberg labeled as **"Whisle Blowing".** Defendant Tong already joined Defendant Lehman in writing their complaint dated Sept. 16, 2005 that initiated the tenure revocation process and this led to a flawed deliberation of a faculty panel chaired by Professor Schaffner of GW Law School.

**The court should make a note of the fact that GWU, in its history of 185 years (1821-2006), never sought to revoke tenure of any tenured professor.**

9. Defendants directly and deliberately caused my false arrest and imprisonment on Sept. 1st, and then again on Sept. 2nd. The second incident could have easily been avoided if the Defendants communicated the suspension letter even in the evening of Sept. 1st, when I went to **my classroom** to teach. They could easily deliver the letter through the hand of the alternate teacher Prof. Vojcic (a former student of mine in Information Theory) who took over the class after I was arrested.

10. Defendants publicized the humiliation of Prof. Saha in the public eye by arresting him in front students and parading him in the crowded Gelman Library on Sept. 1st, 2005.

**Plaintiff Exhibit 3**

- Hatchet Centennial
- Hatchet Alumni

- Blog
  - Hatchet Blog
  - Sports Blog
  - SA Blog
  - Sex Blog

- Podcast

Search...  ➡

Home > Campus News



CI Guide
Summer 2007

# GW students arrested while protesting workers' rights

**by Gabriel Okolski**

**Issue date:** 4/1/04 **Section:** Campus News

A group of GW students Tuesday called on the University to drop charges against 11 demonstrators who were arrested while trying to occupy the Marvin Center earlier in the week.

In a rally outside Rice Hall, about 30 students also urged GW to increase its employees' salaries and health benefits and join the Workers' Rights Consortium, an oversight group that ensures companies aren't violating labor laws.

"We're here today to support our students and demand that the University drop its charges," said junior Timothy Kaldas as he stood in front of the building that houses the office of GW President Stephen Joel Trachtenberg.

The arrest of nine GW and two Georgetown students and would not deter activists from demonstrating for greater worker compensation, junior Alex Freedman, who was not detained in Monday's protest.

"We will continue to carry out our campaign with an even louder voice," she said.

University officials reached for comment Wednesday afternoon said they were unsure whether GW would agree to drop unlawful entry charges against the students.



Media Credit: Paul Goodman

While the Marvin Center is a public venue, refusing to vacate any piece of University property constitutes unlawful entry, according to the Student Code of Conduct.

At 1 p.m. Monday, students gathered in the Marvin Center Great Hall and set up tents, saying they would occupy the space until the University met their demands. About 45 minutes later, MPD arrested 11 students, including two from Georgetown University, for refusing to comply with GW's order to leave the building.

http://media.www.gwhatchet.com/media/storage/paper332/news/2004/04/01/CampusNews/Gw.Students....   8/15/2007

11. Forty minutes of imprisonment and humiliation of Prof. Saha within the hearing and viewing distance of students, faculty, staff and visitors to the front of ECE department (ref. to item 8 above), and parading him out of the building clearly established that Defendants publicized the humiliation of Prof. Saha deliberately to the fullest extent up to their desire. Following are a few of many ways the Defendants could reduce the publicity :

- SERVE the suspension letter on August 29 or August 30, 2005, the two days when Prof. Saha was available in his office,
- Hand deliver the suspension letter on Sept. 1st evening  via the alternate teacher who took over the class after he was arrested.
- SERVE the Bar Notice in the classroom on Sept. 1st, 2005 when GWU's uniformed police officers arrested him. The court should note GW's Lehman administration served the Bar Notice in the classroom when they arrested Prof. Saha in February 1997 after a similar plot of entrapment. However, VP Lehman had to reinstate Prof. Saha after an investigation in 1997.

12. As a direct and proximate results of Defendant's actions, I suffered emotional distress , damages to my reputation, embarrassment and humiliation. Defendants acted willfully, wantonly, maliciously, and in reckless disregard of my rights and reputation, thereby making themselves liable for punitive damages as claimed in the first amended complaint.

## Count III : Invasion of Privacy and False Light

1. Professor Saha established his Professional reputation within the GW community over a period of service of Nineteen years. He taught not only at the Foggy Bottom campus, but also in NASA, Virginia campus, as well as on GW TV for many years. He is a former Chairman of Washington D.C.-Northern Virginia Chapter of IEEE Information Theory Society. He has many acquaintances in Washington community. Even on Sept. 1st, 2005, on his way to his classroom Gelman-609 where he was arrested, a former student  who now works for Gelman Library, greeted him at the entrance of the Gelman Library and chatted for a few minutes. For many years Prof. Saha served as Academic Advisor of more than one hundred undergraduate students at any given time. Some of these undergraduate students are still around as graduate students or employee of GWU. In spite of such ties to GW community, on Sept. 1st and Sept. 2nd, 2005, the Defendants acted recklessly in total disregard to the rights and reputation of Prof. Saha. They placed Prof. Saha under  custody of four/five uniformed police officers and paraded him openly by those officers not once but twice, once in the evening and once in morning.

The Defendants, who brought shame and disgrace to academia of higher learning in 1996-1997 through their **corrupt academic practices and collective moral bankruptcy**,

21

after all, are truly light blind; they carried out their vengeance in both day light and darkness of night. Boundless audacity indeed !! Academia is supposed to transcend all powers and authorities of race, religion, color, gender, and geo-political affiliation. Perhaps, it is only the Defendants who know the source of their strength for such Boundless audacity. ***Plaintiff respectfully requests the court to take a note of this extreme audacity on the part of the Defendants who were trusted with the moral bringing up of our children.***

2. On Sept. 1st, 2005 evening Defendants improperly publicized facts about Plaintiff which placed Plaintiff in a false light by attributing to his conduct characteristics which were false and deserving of arrest and being escorted out of the classroom by special police officers employed by GWU.

3. On Sept. 2nd, 2005 Defendants acted more recklessly in putting Plaintiff again in false light by

- confining him in his own office with doors open for forty minutes while surrounded and interrogated by three police officers inside,
- allowing reasonably loud conversations by a fourth officer from open hallway outside his office door,
- interrogating, confiscating his office key, and parading him surrounded by uniformed officers in the presence of known students, faculty, staff of his own department.

4. Defendants knew that the facts they publicized or caused to be publicized about the plaintiff were false, or printed with reckless disregard for truth to those facts.

5. Defendants wrote on page-6 :
    " To state a claim for invasion of privacy for false light, Saha must show (1)publicity (2) about a false statement, representation or imputation (3) understood to be of and concerning Saha, and (4) which places in a false light that would be highly offensive to a reasonable person. Lohrenz v. Donnelly, 223 F.Supp.2d 25, 40 (D.D.C. 2002) (Lamberth, J.)"

    In the foregoing analyses, it is clearly established that the set of four criterion the Defendants cited above for litmus test of Invasion of Privacy and False Light are convincingly fulfilled.

6. Defendants' actions of publicizing false representations or imputations about Professor Saha placed the Plaintiff in a false light that would be highly offensive to a reasonable person. As a direct and proximate results of Defendant's actions, the Plaintiff suffered emotional distress , damages to his reputation, embarrassment and humiliation. Defendants

acted willfully, wantonly, maliciously, and in reckless disregard of rights and reputation of the plaintiff, thereby making themselves liable for punitive damages as claimed in the first amended complaint.

## Count IV : Declaratory Judgment

**Observation 1:**
On page-11 GW Counsel Mishkin wrote :
"As explained above, supra at 3, Count IV was filed before the University revoked Saha's tenure......"

**Response to 1:**
Again, here comes the question of credibility of Mr. Mishkin. Defendants' improper attempt of tenure revocation of Prof. Saha fell short of completion.  After the tortuous acts of Sept. 1st and Sept. 2nd of 2005, the Defendants made an attempt of revoking Professor Saha's tenure via a fraudulent process. Refer to Affidavit #12 : on procedurally illegitimate Faculty Senate Hearing and flawed deliberation *of Schaffner Panel*.  Also, refer to Affidavit #7: On the Credibility of Defendant Lehman and GW Counsel Douglas Mishkin.

The Plaintiff appealed to GWU President Stephen Joel Trachtenberg against the flawed deliberation of faculty hearing, and as result, ***Executive Vice President Defendant Lehman recused himself***. President Trachtenberg communicated this development to the Plaintiff through his Memorandum dated December 27 and  letter dated December 28, 2006 (Plaintiff Exhibit 39). Without any resolution to the Appeal, or any notification of termination of appointment from President Trachtenberg, ***the tenure revocation process fell short of completion***, and, currently in the Fall of 2007, GWU Faculty Senate, amongst the opposition of GW Counsel Mishkin, ***instituted its Grievance Procedure against Defendant Lehman and the George Washington University***.

**Observation 2:**
On page-11 GW Counsel Mishkin wrote :
"The tenure revocation proceedings referenced by Saha (First Am. Compl.-31) were governed by the University's Faculty Code. Nothing in that Code contains or hints at any "statute of limitations" within which the University must initiate proceedings to terminate a faculty member's employment for persistent neglect, and Saha does not allege that there is any such Code provision......."

**Response to 2:**

Counsel Mishkin is quite correct on this point. But irony is that neither Mr. Mishkin nor the Defendants followed this interpretation in conducting themselves during the faculty proceedings against Prof. Saha.

The Defendants initiated the process of revocation of Plaintiff's tenure through an internal procedure that is governed by the GW Faculty Code (Plaintiff Exhibit A). During this faculty hearing (Sept.2005-July 2006), the Defendants as well as the faculty panel vigorously insisted on relying only on post April 1999 events for deliberation. The panel deliberation (Plaintiff Exhibit B) was based on *time-barred events*; the cut-off date was conveniently chosen as April 30, 1999 (page 2-of-13, Plaintiff Exhibit B). Thus all events, evidence and documents on the following issues were excluded :

*(a) 1996 Whistle Blowing on corruption and favoritism that compromised the integrity of higher learning,*
*(b) 1997 inappropriate Police Action and Escorting Professor Saha out of his classroom, violating his civil rights,*
*(c) Evidence of 1999 conspiracy by Defendant Lehman and Retaliation against Plaintiff through a FALSE charge of Scientific Misconduct, which was later dropped,*
*(d) Perjury on 1999 event that can be easily proven by existing audio tapes at the disposal of Plaintiff, and*
*(e) Other complaints and evidence of harassment, discrimination, and retaliations against Plaintiff.*

Though both parties agreed that **"The Root Cause"** behind the ten year old controversy was the 1996 Qualifying Exam incident, yet the Defendants and the Senate Panel, very selectively, chose to exclude the crucial facts, evidence and documents *by time-barring allowable events.* As acknowledged by Mr. Mishkin, **GWU Faculty code doesn't allow such time barring**. Plaintiff's first amended complaint is not isolated from **"The Root Cause"**. Rather it is just one set of demonstration from many sets of vengeful retaliatory events that were carried out by the Defendants over a period of one decade since the whistle blowing. Therefore, the events and evidence that are related to above outlined items (a) through (e) carry weight in supporting Plaintiff's complaint and are essentially relevant for establishing **Defendants' motives and long term behavioral tendencies**.

Justice prevails only when the truth is enlightened. In this case the truth is imbedded in the **"The Root Cause"**. The Plaintiff maintains that the truth does not have to show respect to any administration, to any institution, or even to any society. Rather, society, institution, and administration have to bow down and show respect to the truth. The

Plaintiff respectfully requests the Court to address the TRUTH and carry out the JUSTICE.

**Observation 3:**
Counsel Mishkin continued on page-12 to write :

"...it is implicit that "persistent neglect" could require an examination of a prolonged pattern of misconduct extending longer than three years or beyond any particular period of limitations."

**Response to 3:**
Mr. Mishkin is again right and, therefore, should have no objection to Plaintiff's following request to the Court :

"...it is implicit that "dark secrets of GWU" could require an examination of a prolonged pattern of misconduct extending longer than three years or beyond any particular period of limitations."

and the Defendants' **corrupt academic practices and collective moral bankruptcy** over 1996 Qualifying Exam Scandal is perhaps just one of those "dark secrets" that President Stephen Joel Trachtenberg referred to in a recent address to the **Board of Trustee of the George Washington University** [ Plaintiff Exhibit 47].

The Defendants' plea in favor of *time-barring* allowable events and evidence in conducting the faculty proceedings were improper, and the Schaffner panel, by allowing such time-barring, acted improperly and *prejudiced the deliberation*. Though the tenure revocation process fell short of completion, yet the Defendant GWU, among other retaliatory actions, stopped Plaintiff's pay cheque effective March 1st, 2007 and caused financial harm to the Plaintiff. The Plaintiff, therefore*, respectfully request the court to enter declaratory judgment that Senate Panel deliberation lacks merits, needs no further consideration, and  decisions made upon influence of that deliberation are improper.* The Plaintiff further requests that court dismiss Defendants' motion for Summary Judgment and grants declaratory judgment on Count IV in favor of Plaintiff and against the Defendants.

**6. List of  Plaintiff's Affidavits :**

1. Affidavit : Disputing Declaration of  Archie
2. Affidavit : Disputing Declaration of  Lehman
3. Affidavit : Disputing Declaration of  Little
4. Affidavit : Disputing Declaration of  Tong
5. Affidavit : Disputing Declaration of  Walston
6. Affidavit  : Disputing Declaration of  Williams

7. Affidavit : On the Credibility of Defendant Lehman and GW Counsel Mishkin
8. Affidavit : On Motives and Behavioral Tendencies of the Defendants
9. Affidavit : On 1996 GWU Qualifying Exam Scandal and Whistle Blowing
10. Affidavit : Disputing the wrongful portrayal of the Plaintiff as violent
11. Affidavit : On the 1999 Conspiracy by Defendant Lehman and FALSE charge of
     Scientific Misconduct against Plaintiff.
12. Affidavit : On procedurally illegitimate Faculty Senate Hearing and flawed
     deliberation of *Schaffner Panel*
13. Affidavit : On Retaliation by Defendants Lehman, Tong and GWU
14. **Affidavit** : On Irregularities in VA Campus as it affected the Plaintiff


## 7. List of Plaintiff Exhibits :

1. Plaintiff Exhibit 1: Bar Notice and Identity of Officer who served the Notice
2. Plaintiff Exhibit 2: Handwritten Instruction served on Sept. 2nd, 2005
3. Plaintiff Exhibit 3: Typical scenario when subjects do not obey GWUPD
4. Plaintiff Exhibit 4: Testimony of Korman, p.152, Jan. 30, 2006, GW Hearing
5. Plaintiff Exhibit 5: Sept. 2nd, 2005 e-mails of Lehman and others; six pages
6. Plaintiff Exhibit 6 : Testimony of Lehman, p.52, March 20, 2006, GW Hearing
7. Plaintiff Exhibit 7: Excerpts from Hearing Proceedings, p.49-50, March 20, 2006
8. Plaintiff Exhibit 8: Tong's letter dated March 28, 2002
9. Plaintiff Exhibit 9 : Saha's response dated Sept.9, 2005
10. Plaintiff Exhibit 10: Handout, Class list, Bulletin Board Info.on Saha's teaching
     ECE-243, Fall 2005
11. Plaintiff Exhibit 11: Korman's e-mail, Sept. 2nd, 2005
12. Plaintiff Exhibit 12 : Picture of Saha's Car
13. Plaintiff Exhibit 13 : Letters of Lehman, August 29, July 26, June 27, 2005
14. Plaintiff Exhibit 14 : Tenure Revocation Complaint, Sept. 16, 2005
15. Plaintiff Exhibit 15 : GW Hearing Brief (Lehman's)
16. Plaintiff Exhibit 16 : GW Counsel Mishkin's e-mail, 03/09/2006
17. Plaintiff Exhibit 17 : e-mail of Schaffner regarding May 2nd, 2005 meeting
18. Plaintiff Exhibit 18 : Hearing Transcript, March 20, 2006, p.45
19. Plaintiff Exhibit 19 : Hearing Transcript, 03/06/06, p-396
20. Plaintiff Exhibit 20 : *"Still Teaching is noble in America !"*
21. Plaintiff Exhibit 21 : Saha's Report to Wooldridge-Ramakar Committee in 1997
22. Plaintiff Exhibit 22 : A set of evidence on 1996 Qualifying Exam Scandal
23. Plaintiff Exhibit 23 : May 15, 1996 Saha's "Dear Colleague Letter " & April
     16, 1996 Memo of Zaghloul
24. Plaintiff Exhibit 24 : Series of 1996 letters between Saha & Linda Salamon :
     May 16, May 29, June 3, 1996

25. Plaintiff  Exhibit 25 : Lehman's Sept. 2nd, 2005 e-mail on panic button
26. Plaintiff  Exhibit 26 : July 31, 1997 Memo of Zaghloul
27. Plaintiff  Exhibit 27 : August 8, 1997 Memo of Interim Dean Mazzuchi
28. Plaintiff  Exhibit 28 : Feb. 4, 1997 Memo of Zaghloul
29. Plaintiff  Exhibit 29 : Police Complaint of Zaghloul dated 02/06/97
30. Plaintiff  Exhibit 30 :  Shelly Heller's Aug. 22, 1997 e-mail to Lehman
31. Plaintiff  Exhibit 31 : Jan. 11, 1999 Memo to Univ. Police
32. Plaintiff  Exhibit 32 : Jan. 25, 1999 Memo of Loew to Univ. Police
33. Plaintiff  Exhibit 33 : Jan. 25 and Feb. 23, 1999 Memo to Rocco Grande, UPD
34. Plaintiff  Exhibit 34 : Minutes of Feb.9, 2005 meeting
35. Plaintiff  Exhibit 35 : Loew's Testimony, p.111-112, April 25, 2006
36. Plaintiff  Exhibit 36 : August 20, 1996 letter to Zaghloul
37. Plaintiff  Exhibit 37 : Jan. 8, 1999 letter signed by Mazzuchi and Loew &
     Jan. 15, 1999 letter of Loew
38. Plaintiff  Exhibit 38 : *"A Compelling Account : Flawed Deliberation of Schaffner Panel"*
39. Plaintiff  Exhibit 39 : A set of two letters from President Trachtenberg dated
     Dec. 27 & Dec. 28, 2006, Lehman's Nov. 18, 2005 letter, and Oct. 11, 2005
     letter of UPD Chief Stafford
40. Plaintiff  Exhibit 40 : Hearing Testimony, p. 418, March 6, 2006
41. Plaintiff  Exhibit 41 : Testimony, p.17-18, Transcript, Jan. 30, 2006 Hearing
42. Plaintiff  Exhibit 42 : Testimony, p.138 &171, Transcript, Jan. 30, 2006 Hearing
43. Plaintiff  Exhibit 43 :  Two Memos of 1992
44. Plaintiff  Exhibit 44 :  Letters concerning 1996-1997 events
45. Plaintiff  Exhibit 45 :  Letters concerning 1999 events
46. Plaintiff  Exhibit 46 :  Dispute Resolution Committee that heard Saha's appeal
47. Plaintiff  Exhibit 47 : Trachtenberg's Remarks to B.O.T.of GWU, May 19, 2006
48. Plaintiff  Exhibit 48 :  Statement under oath of Edward  Della Torre
49. Plaintiff  Exhibit 49 : Debby (Swanson)'s August 29, 2005 statement
50. Plaintiff  Exhibit 50 :  August 29, 2005 e-mail of Korman and others
51. Plaintiff  Exhibit 51 :  Jan. 30, 2006 Testimony of Korman
52. Plaintiff  Exhibit 52 :  Jan.4, 2002 Memo that in Fall 2005 revealed the existence
     of  a Secret Mail Box  designated for Saha
53. Plaintiff  Exhibit 53 :  Saha's Fall 2007 GW Office address, Ph. no., emergency
     contact, Faculty Detail Schedule
54. Plaintiff  Exhibit 54 : Jan. 18, 2002 Memo of Marshall & Jan. 22, 2002 Memo
     of Vojcic
55. Plaintiff  Exhibit 55 : Saha's Spring 2008 course assignment and his status as
     member of faculty for 2007-2008.

# 8. Conclusions of the Response to Motion for Summary Judgment

The Plaintiff moves that the court dismiss Defendants' motion for Summary Judgment, and request the Court to enter judgment in favor of Plaintiff and against the Defendants on all counts of Plaintiff's First Amended complaint. The Plaintiff therefore demands judgment against Defendants, jointly and severally, for the amount of $10,000,000 in compensatory damages and $10,000,000 in punitive damages, plus interest, and reasonable costs and fees. Plaintiff further requests the Court to grant such other and further relief as the Court deems appropriate, proper and just.

Among immediate concerns for the proceedings to continue, it should be noted that, *in contrast to Nov. 18, 2005 letter of Lehman* (Plaintiff Exhibit 39), GW stopped Plaintiff's pay cheque effective March 1st, 2007 without any notification. GW is now actively engaged in financial strangulation of Prof. Saha with the intent to put Saha in extreme financial situation to stop Grievance Proceedings at the Senate and stop Legal Proceedings at this Court. Plaintiff, therefore, respectfully requests the court to grant immediate relief as the court deems appropriate and just.

# II

**Legal Opinions**

**Court Cases**

**and**

**Analysis**

## A. Time Barring :

It is acknowledged by both parties that four suspensions of Plaintiff Saha started with the Root Cause of 1996 Qualifying Exam Scandal; each time, however, Defendant Lehman had to reinstate Saha after failing to prove any fault with Saha. Defendants' motion for Summary Judgment capitalized on the deliberation of a tenure revocation attempt (which fell short of completion) after the fourth suspension, the proceeding of which was governed by GW Faculty Code. The complaint for tenure revocation (Plaintiff Exhibit 14) relied on events that date back to 1996. Yet the Defendants as well as the faculty panel vigorously insisted on relying only on post April 1999 events for deliberation. The panel deliberation (Plaintiff Exhibit B) was based on *time-barred events*; the cut-off date was conveniently chosen as April 30, 1999 (page 2-of-13, Plaintiff Exhibit B).**GWU Faculty code doesn't allow such time barring**.

Therefore, it would be improper to exclude pre-1999 events and evidence in deciding the present case. Courts routinely allow background evidence as proof of unlawful intent and defendants' long term behavioral tendencies:

*McDonnel Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817 (1973) : "Other evidence that may be relevant to any showing of pretext includes facts as to the petitioner's treatment during his prior term of employment; petitioner's reaction, if any, to respondent's legitimate civil rights activities;"

*Andrews v. City of Philadelphia*, 895 F.2d 1469, Third Circuit Court (1990) : "A play cannot be understood on the basis of some of its scenes but only on its entire performance, and similarly, a discrimination analysis must concentrate not on individual incidents, but on the overall scenario."

In the present case, Plaintiff Saha's previous arrest in 1997, the evidence on 1996 Qualifying Exam Scandal and the associated reports, Personal committee's 1999 acquittal of Prof. Saha from any wrong doing, 1999 harassment through false charge of Scientific Misconduct, and evidence on Character Assassination of Plaintiff all are relevant and should be admissible in the court. The story the court and the Jury should be relying upon is an uninterrupted continuous story, not a story of convenience of Defendants.

30

## B. Count I : Violation of 42U.S.C.-1983

In Memorandum of Points and Authorities (page-10) Defendants cited ***Hoai v. Vo, 935, F. 2d 308, 312 (D.C. Cir 1991)*** and argued that Saha can not establish that he was deprived of a right secured by the Constitution of laws of the United States, and, therefore, summary judgment is appropriate in favor of Defendants.

Defendants' claim is based primarily on (a) their alleged undisputed material fact No. 2, and Declarations of Defendant (b) Lehman, (c) Tong, (d) Little, and (e) Walston. Each of these five items has been disputed; see Item 2 of Plaintiff's point by point response, and Affidavit 2, 3, 4, and 5. The Defendants failed to establish that Prof. Saha was SERVED the notice of suspension on or before Sept. 1st, 2005. Plaintiff Saha, therefore, through his contractual agreement with GWU, on Sept. 1st evening,

(a) had the right to be in the classroom GEL-609 during 7:10-8:40pm
(b) had the right to continue to lecture that evening in GEL-609
(c) had the right to move freely any where he chose to inside and outside GEL-609
(d) had the right to be portrayed as law abiding peaceful person
(e) had the right to claim to the professional reputation that he acquired over a period of almost two decades

Professor Saha was deprived of all of these rights. In addition, Prof. Saha is continued to be deprived of his right to claim to his children and family that indeed they live in a just society. In summary, Defendants' arguments for motion of summary judgment in favor of Defendants lack merit. Plaintiff reiterates his allegation 21 and 22 of the first Amended Complaint.

Legal Analysis :

To observe why GW's Hoai v. Vo case lacks merit in drawing similarity with the present case, one may observe the following excerpts from the case :

1.    "[**6] In August 1989, Hoai and Hemenways filed the civil rights action underlying this appeal. At the heart of the appellants' claim are alleged abuses of the D.C. Superior Court process by Vo, Sunoco and their respective attorneys. In essence, the appellants allege that they were deprived of their civil rights in violation of sections 1983 and 1985 when the appellees lied to the court in order to obtain the initial TRO and then impermissibly excluded Hoai and his attorney from proceedings resulting in an extension of TRO."

2.    "[**11]............In other words, what is alleged is an abuse of the D.C. Court system by private litigants and their attorneys. See *id* at paras 27, 45, reprinted in J.A. 9,17 (alleging violations of local laws and rules)."

3.    "............Therefore, section 1983 liability turns on whether the appellants' complaint can support a finding of "joint activity" by the appellees and the District of Columbia or its agents. 5 We find that it cannot."

In the present case :

(a) Saha had clearly established rights as claimed above under his contractual agreement with GWU

(b) Under the law of District of Columbia, GWU's police officers are "stateactors" for the purposes of 42 U.S.C.-1983.

(c) GWU's Special Police Officers were acting within the scope of their employment and under the color of state law and at the direction of highest ranking officials of GWU, including Defendants Lehman and Tong, who were the final decision makers for GWU.

Thus while Hoai's claim under 1983 relied on his allegation of abuse by private litigants of the D.C. Court system, Saha's claim relies on actual contractual right that existed on Sept. 1st and Sept. 2nd, 2005 and the actual events of arrests, imprisoments, and Perp Walk on those two days.

Defendants overdrew the similarity between the two cases and their attempt lacked intellectual merit.


# C. Count II : False Arrest and Imprisonment

Defendants argued : "to establish his claim of false imprisonment, Saha must show that he was unlawfully detained so as to be deprived of his personal liberty or freedom of locomotion."

Defendants cited **opinion of Judge Lamberth** : **Robinson v. District of Columbia**, 2006 WL 2714913, Sept 22, 2006, and further argued : "[T]he gist of any complaint for ....false imprisonment is an unlawful detention."

First, we establish that the present case of Saha and the cited case of Robinson are very different in their makeup, and, therefore, lack merit in drawing similarity. Then we establish that indeed Prof. Saha was deprived of  his personal liberty or freedom of locomotion and was detained unlawfully.

Justification of Robinson's arrest lies in the following excerpt.

1. "FN5   Defendants also assert that plaintiff's failure to produce a valid motor vehicle operator's permit justified his arrest under D.C.Code :50-1401.01(c). "

Other reasons for his arrest are in the following  excerpts :

2. "A security officer at 1615M Street NW came to the scene and identified [plaintiff] as the man she had observed carrying what appeared to be a crowbar walking up and down the sidewalk, looking into ca[r]s, and touching door handles."

3. "A victim's social security card....[was] recovered from [plaintiff's] coat pocket]."

In the present case, on Sept. 1st, 2005 evening when Prof. Saha  was arrested, Saha, through his contractual  agreement with GWU and as per direct instruction from ECE Department, had clearly established right to be in GEL-609 (see section on count II in Plaintiff's Response to Defendants' viewpoints on four counts).

- He was unlawfully arrested and removed from that class
- His right to freedom of locomotion inside the classroom was restricted by the police officer who entered the room while he was teaching
- He had the right to move anywhere he chose to outside the classroom on the campus, but four/five uniformed police officers restricted his mobility by building a wall surrounding him and escorting him through the hallway, elevator, and finally out of the library building.

On Sept. 2nd, 2005 he was arrested and imprisoned again when

- uniformed officers confined him in his own office with doors open for forty minutes while surrounded and interrogated by three police officers inside
- he was perp walked by uniformed officers in the presence of known students, faculty, and staff members of his own department (See Affidavit#1 for further clarification.).

Prof. Saha (a) did not fail to show his GW-ID card, (b) did not unlawfully possess other's social security card, or (c) did not posses a crow bar for vandalism; he was carrying education materials.

Defendants' attempt of drawing similarity between the two cases lacks merit. Further, Defendants' litmus tests on deprival of freedom of locomotion and unlawful detention are convincingly satisfied.

## D. Count III : Invasion of Privacy and False Light

Defendant cited ***Judge Lamberth's opinion*** on ***Lohrenz v. Donnelly, 223 F. Supp. 2d 25 U.S. Dist. (2002).*** Defendants argued that to state a claim for invasion of privacy for false light, Saha must show (1) Publicity , (2) about a false statement, representation or imputation (3) understood to be of and concerning Saha, and (4) which places him in a false light that would be highly offensive to a reasonable person. In the present case, we already established the following :

# (1) Publicity

On Sept. 1st, 2005
- arrest of plaintiff in the classroom in front of students
- parading in the hallway and elevator of a crowded library
- escorting out of the lobby of crowded Gelman library

On Sept. 2nd, 2005
- confining him in his own office with doors open for forty minutes while surrounded and interrogated by three police officers inside
- allowing reasonably loud conversations by a fourth officer from open hallway outside his office door
- interrogating, confiscating his office key, and parading him surrounded by uniformed officers in the presence of known students, faculty, staff of his own department.

# (2) A false statement or imputation & (4) false light

- On Sept. 1st, 2005 evening Defendants improperly publicized facts about Plaintiff which placed Plaintiff in a false light by attributing to his conduct characteristics which were false and deserving of arrest and being escorted out of the classroom by special police officers employed by GWU.

- On Sept. 2nd, 2005 Defendants acted more recklessly in putting Plaintiff again in false light by confining him in his own office with doors open for forty minutes while surrounded and interrogated by three police officers inside and parading him surrounded by uniformed officers in the presence of known students, faculty, staff of his own department.

Defendants knew that the facts they publicized   or caused  be publicized about the plaintiff were false, or printed with reckless disregard for truth to those facts.

# (3) understood to be of concerning Saha

- As far as I know, there is only one Saha Debabrata around whom all the events took place. So there is no ambiguity.

In the foregoing analyses, it is clearly established that the set of  four criterion the Defendants cited for litmus test of Invasion of Privacy and False Light are convincingly fulfilled.

## E. Count IV : Declaratory Judgment

The Defendants argued on p-11 of part-2 of motion for summary judgment: " The District of Columbia three-year statute of limitations on claims for breach of contact is simply   inapplicable   to   a     university's   internal   disciplinary   proceedings.   D.C. Code-12-301(7) (2001). It correctly refers to **Kyriakopoulos v. George Washington University**, 866 F. 2d 438 (D.C. Cir. 1989), couple of excerpts of which are follows :
1. "Eschewing any further internal grievance proceedings, Kyriakopoulos filed suit in United States District Court in March 1986."
2. "The complaint set forth various claims. .......The University responded with a motion for summary judgment, which the trial court granted in part in September 1986 by dismissing the first three causes of action as barred by the statute of limitations."

GWU applied D.C. statute of limitation to prevent promotion of Kyriakopoulos in **external** D.C. court legal proceedings, while, upon acknowledging  that three-year statute of limitations does not apply to **internal** proceedings governed by GWU faculty code, applied the same notion **anyway** to time-bar the allowable events and evidence in Saha case. GWU in the faculty senate proceedings vigorously insisted on relying only on post April 1999 events and the panel deliberation was based on **time-barred events**; the cut-off date was conveniently chosen as April 30, 1999 (page 2-of-13, Plaintiff Exhibit B**)**.

*Legal Principle that guided GWU :* ***"apply statute of limitations where it is available for use in favor of GWU, and unlawfully implant statute of limitations where it is not available if it benefits GWU"***.

35

*It is ironic that more bringing up of our children are placed in the hands of such hypocritical administrators in the Capitol of the Nation. Legal principles are supposed to enlighten the moral principles of the society. Treating a patient for its secondary symptom only without addressing the root cause can neither be a moral principle nor an acceptable legal principle. GWU vandalized the Moral fabrics of the Society. Proximity effect of these dishonest administrators already caused wounds and will continue to cause wounds on the moral makeup of our children. On a broader perspective, Plaintiff's stand in 1996 on the integrity of higher learning was indeed a challenge to the immoral persuasions of GWU. Academia is supposed to be nobler than every other institution. It is very sad that President Stephen Joel Trachtenberg, after staying at the helm for almost two decades, in his recent address to the Board of Trustee of GWU, had to acknowledge "Dark Secrets of GWU".*

The Defendants' plea in favor of time-barring allowable events and evidence in conducting the faculty proceedings was improper, and the Schaffner panel, by allowing such time-barring, acted improperly and prejudiced the deliberation. Though the tenure revocation process fell short of completion, yet the Defendant GWU, among other retaliatory actions, stopped Plaintiff's pay cheque effective March 1st, 2007 and is now actively engaged in causing financial harm to the Plaintiff. Plaintiff requests the court to enter declaratory judgment that Senate Panel deliberation lacks merits, needs no further consideration, and decisions made upon influence of that deliberation are improper.

A number of faculty members of GW Law School guided and strengthened the above mentioned *"Legal Principle"* that guided GWU. They are all well educated by virtue of their distinguished degrees from reputed universities. Unfortunately, those degrees did not help them distinguishing right from wrong. On the other hand, a well known gentleman lawyer, who helped building this nation, when elected to the Congress wrote in the Congressional directory that his education was defective, perhaps because he had no formal university degree. He had lot of common sense though Voltaire, many centuries back, found *common sense is not so common.* The point here the Plaintiff is trying to make that hiring, retention, and firing process in GWU does not have any checks and balances with respect to moral behavior and tendencies of the administrators and faculty members. GWU President Stephen Joel Trachtenberg, in a one-to-one meeting in 1997, agreed to the Plaintiff on this point. The Plaintiff respectfully request the court to address the issue of *"Legal Principle that guided GWU "* in the context of the present case.

# III

## Conclusions
## drawn from

## Factual Materials (Section I)
## and
## Legal Analysis (Section II)

# Factual materials

- In 1996, Tenured Professor Debabrata Saha of GWU exposed practice of corruption and favoritism that compromised the integrity of Academia of higher learning in the Capitol of the Nation.

- During 1996-1997 period, the Chairperson of the Department Prof. Saha belonged to was Prof. Mona Zaghloul; relevant dean of Engineering School was Prof. Gideon Frieder and the Vice President for Academic Affairs was Prof. Linda Salamon. The administration tried to cover up the wrong doings and started harassing Prof. Saha. The administration systematically and gradually took away resources for Prof. Saha's well being and professional development. The administration cut off his contacts with about 110 undergraduate students and about 60 graduate students of whom he was the advisor. In the words of a few colleagues, they conspired to put Prof. Saha over the edge so that they could find faults with Prof. Saha and get rid of him from GWU. At the suggestion of VP and General Counsel Blumer, Prof. Saha filed charges of harassment, discriminations and retaliations against Prof. Zaghloul of the Lehman administration (Plaintiff Exhibit 44).

- In 1997 the Defendants caused false arrest of Prof. Saha inside his classroom and the newly appointed VP for Academic Affairs Donald R. Lehman suspended him. President Sphen Joel Trachtenberg, in his one-to-one meeting with Prof. Saha labeled Prof. Saha's actions as whistle blowing, and suggested Prof. Saha to keep low profile and asked him not to speak to Chairwoman Zaghloul and her associates who were associated with the issues of corruption.

- Since his taking office in 1997 till Fall 2004, VP Lehman suspended Prof. Saha three times and each time he had to reinstate him. In 1999, ECE personnel committee acquitted Prof. Saha of any wrong doing. In  the same year, VP Lehman brought charges of Scientific misconduct against Prof. Saha which he had to drop later after investigation.

- Vice President Lehman simply renewed his efforts to solidify his power and revoke Professor Saha's tenure in 2005. Vice President Lehman had an opportunity to do so because Prof. Zaghloul returned to power, for six months, as interim Chair after Prof. Vojcic declined to assist Lehman in firing Professor Saha. Defendant Lehman's associate, Dean Tong of Engineering School never met Prof. Saha in his first five years of his office as dean.

- Lehman, Tong, and Zaghloul and some associates teamed up in Spring of 2005 to revoke Prof. Saha's tenure through a fraudulent process that later led to a procedurally

illegitimate tenure revocation attempt. The deliberation of the relevant hearing was rigged by Lehman against Prof. Saha from the very beginning; the details are choreographed by Prof. Saha in two of his academic papers : *"Still Teaching is noble in America !"* and *"A Compelling Account : Flawed Deliberation of Schaffner Panel"*. President Trachtenberg testified in the hearing that he was aware of the attempt of tenure revocation.

- On August 29 and 30, 2005 Prof. Saha was instructed by ECE department about his teaching responsibilities for the Fall semester and following that instruction Prof. Saha went to classroom GEL-609 to deliver his first lecture. After ten minutes into the lecture he was arrested by GWUPD in front of his students and was escorted out of the building. The next morning on Sept. 2nd, 2005, Prof. Saha was again arrested and imprisoned in his office, and was perp walked out of the building.

- Prof. Saha's first amended complaint to this court against Defendant Lehman, Tong and GWU are violation of civil rights under 1983, false arrest and imprisonment, invasion of privacy and false light, and improper attempt of tenure revocation.

- Procedurally illegitimate tenure revocation hearing panel was chaired by Prof. Schaffner of GW Law School. The deliberation, which was rigged from the beginning against Prof. Saha, addressed mainly two charges :

  (1) Personal neglect of professional responsibilities
  (2) Gross and Personal misconduct that destroys academic usefulness

- Schaffner panel acquitted Prof. Saha of the 2nd charge but found Prof. Saha engaged in persistent neglect of professional responsibilities for an extended period which provides adequate cause for tenure revocation. The masterpiece of flawed deliberation of the panel chaired by a Professor of GW Law School is breathtaking and abominable by any standards of any civilized society. This masterpiece is choreographed in *"A Compelling Account : Flawed Deliberation of Schaffner Panel"*.

- Schaffner panel sought tenure revocation  based on Professor Saha's alleged failings during the period of 2000-2005 when Prof. Vojcic was Chair, even though it was Prof. Vojcic's judgment that there was no justification for creating a Subcommittee to investigate Prof. Saha. There is no basis for overruling Vojcic's decision and it would be improper for the panel to substitute its judgment for that of Personnel Committee that met in 2002, but did not decide any action was required or the judgment of Prof. Vojcic as Chair.  (Plaintiff Exhibit 40).

- Prof. Saha considers his moral stand on 'the 1996 Academic Vandalism in GWU' an important service to the students and the University community. Prof. Saha maintains that he never indulged himself in neglect of professional responsibilities.  He, after suggestions of President Trachtenberg, only changed the nature of participation in academic life, he neither ceased to participate in it nor sold his moral conscience for participation in it.

- After a fail in the appeal to the Faculty Senate Dispute Resolution Committee (Plaintiff Exhibit 46), Prof. Saha appealed to GWU President Stephen Joel Trachtenberg against the flawed deliberation of faculty hearing, and as result, *Executive Vice President Defendant Lehman recused himself*. President Trachtenberg communicated this development to the Plaintiff through his Memorandum dated December 27 and  letter dated December 28, 2006, Plaintiff Exhibit 39.

- Without any resolution to the Appeal, or any notification of termination of appointment from President Trachtenberg, *the tenure revocation process fell short of completion*, and, currently in the Fall of 2007, GWU Faculty Senate, amongst the opposition of GW Counsel Mishkin, *instituted its Grievance Procedure against Defendant Lehman and the George Washington University*.

- Defendants used the Schaffner panel deliberation to bring a motion to the Court for summary judgment and Prof. Saha, through this response, requests that the court dismiss Defendants' motion for Summary Judgment, and enter judgment in favor of Plaintiff and against the Defendants on all counts of Plaintiff's First Amended complaint. The Plaintiff therefore demands judgment against Defendants, jointly and severally, for the amount of $10,000,000 in compensatory damages and $10,000,000 in punitive damages, plus interest, and reasonable costs and fees. Plaintiff further requests the Court to grant such other and further relief as the Court deems appropriate, proper and just.

- Among immediate concerns for the proceedings to continue, it should be noted that GW stopped Plaintiff's pay cheque effective March 1st, 2007, though as per Nov.18, 2005 letter of Lehman, Plaintiff is on paid suspension till further notice . GW is now actively engaged in financial strangulation of Prof. Saha with the intent to put Saha in extreme financial situation to stop Grievance Proceedings at the Senate and stop Legal Proceedings at this Court. Plaintiff, therefore, respectfully request the court to grant immediate relief as the court deems appropriate and just.

# Legal Points and Analysis

- Memorandum of Points and Authorities has been signed by GW Counsel Douglas B. Mishkin. The Plaintiff requests the court to consider Affidavit #7 of Plaintiff in assessing the credibility of Defendant Lehman and GW Counsel Mishkin.

- Defendants' alleged justifications of their actions in Fall of 2005 are based on two primary suppositions : (a) Defendant Lehman suspended Prof. Saha and Prof. Saha was given the knowledge of suspension so that he (i.e. Saha) could act according to his status of suspension starting from the effective date of August 29, 2005 and (b) Aggressive and Violent behavior of Prof. Saha

- Defendants' slanderous attempt of portraying Prof. Saha as violent that raised the concerns of safety of staff members constitute character assassination of Professor Saha. Affidavit #2, 4, 10, and 11 are submitted to dispute Defendants' statements and in support of character assassination charge against Defendants Lehman, Tong, Korman and Professor Murray Loew of GWU. Item (8) of Affidavit #10 relates specially to perjury of Murray Loew.

- Defendants failed to establish that August 29, 2005 suspension letter was SERVED in any timely manner so that Prof. Saha could act according to his status of suspension starting from the effective date of August 29, 2005. Plaintiff Saha submits Affidavit 2, 3, 4, and 5 in support. The Defendants deliberately and maliciously conspired against the plaintiff and mislead the Plaintiff to place the Plaintiff in the classroom so that they could carry out their vengeance and humiliate Prof. Saha in a shaming way.

- Defendant Lehman expressed his justification and resolve on his actions of Fall 2005 in the following excerpt from his August 29, 2005 suspension letter :

   "I am once again disappointed, but not surprised, by your failure to respond in any way to my letters of June 27 and July 26, 2005 and follow up phone calls, for a meeting, and your failure to attend the meeting I scheduled for August 19, 2005. It is with some regret, but with resolve, that I take the following action :"
   [ action of suspension and initiation of tenure revocation]

- The above statement of Lehman appears in retrospect to be disingenuous in light of Lehman's testimony in Senate hearing where Lehman acknowledged that he knew that Prof. Saha did not receive the certified mail letters he sent to Prof. Saha because the letters in issue had already been returned to Lehman and were in his files.

41

- Since Prof. Saha did not receive the June 27, 2005 letter or the July 26, 2005 letter from Vice President Lehman, there is no basis for Saha's suspension or revoking Saha's tenure because of Saha's failure to respond to those letters.

- There is no probative or admissible evidence that the letters were actually sent other than by certified mail. The letters are not marked as having been sent by regular mail as well as certified mail. Since Lehman disclosed that he had the returned letters allegedly sent by certified mail in his possession, there can be no doubt Vice President Lehman intended that Professor Saha *not* receive notice of the pending effort to suspend Saha and revoke Saha's tenure *prior* to final actions being taken.

- Further, Prof. Lehman's statement that copies of June 27, 2005 and July 26, 2005 letters were sent by regular mail is not based on his personal knowledge and should be excluded. Since Professor Lehman knew or should have known that faculty members, including Prof. Saha did not come to campus during the summer, the hearsay statement that copies were placed in Saha's mailbox or under his office door has little probative value.

- Further more, in view of the importance of the matter, Vice President Lehman's failure to send a copy of these letters to Prof. Saha by courier or Fedex is inexplicable.

- Although Vice President Lehman had delivered important messages to Prof. Saha's home in the past, Lehman chose not to do so in 2005. Though Lehman claimed to have made follow up phone calls at Saha's office, Saha couldn't have the knowledge of that message because he did not have the *changed* access code; University documents substantiate that fact.

- In conclusion, Vice President Lehman sought to use Professor Saha's failure to respond to a letter he knew Saha never received as a reason (a) for his suspension that led to the First amended Complaint of Prof. Saha, and (b) for initiating the process of revocation of Saha's tenure that led to *Flawed Deliberation of Schaffner Panel*.

- Defendants failed to establish that August 29, 2005 suspension letter was SERVED in any timely manner so that Prof. Saha could act according to his status of suspension starting from the effective date of August 29, 2005. Plaintiff Saha submits Affidavit 2, 3, 4, and 5 in support. Evidence suggest that, quite contrary to their claim of notifying Saha about suspension, the Defendants deliberately and maliciously conspired against