UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Professor DEBABRATA SAHA, Ph.D., ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> DONALD LEHMAN, et al. ) <br> ) <br> Defendants. ) <br> ) | C.A. NO. 06-1493 RCL |

**DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Plaintiff Debabrata Saha ("Saha") uses almost all of his 44-page single-spaced opposition to Defendants' motion for summary judgment ("Opposition" or "Opp.") and the additional 40 pages of his affidavits to discuss what this case is <u>not</u> about. This case is not about the revocation of Saha's tenure, or about Saha's supposed philosophical disputes with University officials, or about Saha's character or about whether the University engages in "collective moral bankruptcy." Opp. at 21. This case is about the events of September 1 and 2, 2005, when Saha was escorted from a classroom and from his office because he had been suspended. Based upon those events, Saha is suing for false imprisonment, invasion of privacy for false light and violation of §1983. (Saha's claim for declaratory relief, Count IV, is addressed separately).

In their Memorandum of Points and Authorities In Support Of Defendants' Motion for Summary Judgment ("Initial Brief"), Defendants examined Saha's claims element-by-element to show that he has failed to state any such claims. Saha's Opposition is less focused. A line-by-line analysis is neither feasible nor necessary. The Opposition consists largely of three repeated assertions: (1) Saha did not receive Defendant Lehman's August 29, 2005 letter informing him that he was suspended for the fourth time (Opp. at 5, 8-9, 10, 14, 16, 17, 39, 44, Saha Aff. # 2 at 50, 51, Saha Aff. # 4 at 55, Saha Aff. # 5 at 59); (2) more people saw him being escorted out of the

classroom and his office than the University has described (Opp. at 5-6, 10, 16, 21, 22, Saha Aff. # 1 at 47); and (3) the act of escorting him out occurred differently than as described by Defendants (Opp. at 5-6, 10, 11, 16, 18, 21, 22, Saha Aff. # 1 at 47; Saha Aff. # 6 at 60, 61). Among the various things that can be said about these assertions, the most important one is that none of them saves any of Saha's claims from summary judgment.

Assertions (2) and (3) will be addressed below within the analyses of Saha's specific claims. But his first assertion merits special attention. Throughout his Opposition, Saha insists: "I didn't get the letter." (This was Saha's stock response to virtually every written communication over the last decade from anyone associated with the University. See Initial Brief at 1, n.1.) This case is not about whether Saha admits or denies receiving the August 29, 2005 suspension letter – a letter that Lehman had delivered by regular mail, certified mail, by placement under Saha's office door and by same-day hand-delivery to Saha's residence by Quick Messenger Service (cost: $31.50). Fact No. 2 and Ex. B. Saha's denial is not merely preposterous – it is irrelevant.[1] Saha's denial does not supply any missing element of his claims of false imprisonment or invasion of privacy for false light (and of his §1983 claim), and thus does not save them from summary judgment. What remains undisputed is that Saha was suspended on August 29, 2005, and that pursuant to the terms of that suspension he was "not to come to either campus to teach or perform any University responsibilities." Ex. A, Fact No. 2.

---

[1] Defendant Lehman's 9/2/05 email comment "are we sure that he has actually seen and read my letter to him?," quoted by Saha (Opp. at 51) is both justifiable and irrelevant. Given Saha's track record of denying receiving anything from the University since 1997 (Initial Brief at 1, n.1), neither Lehman nor anyone else could have assumed that Saha had actually read what was actually delivered to him. That was the basis for the University's (correct) premonition that Saha would show up for class despite having been suspended. Indeed, as Saha alludes, he did just that in 1997. Despite being suspended, he arrived to teach a class, and University security officers escorted him out at that time as well. Opp. Brief, at pp. 4, 38.

2

I.     **SAHA HAS FAILED TO STATE A CLAIM FOR FALSE IMPRISONMENT (Count II) (Initial Brief at 3-6)**

Saha's claim for False Imprisonment in his First Amended Complaint focuses solely on the night of September 1, when he showed up to teach a class despite being suspended three days earlier. Fact Nos. 1, 2, 7.[2] As set forth below, nothing in Saha's Opposition creates a genuinely disputed material fact enabling his claim to survive summary judgment.

A.     **Saha Was Not Detained**

Nothing in Saha's Opposition cures the logic problem that is fatal to Saha's false imprisonment claim: "please leave here" does not mean "you must stay here." Being asked to leave is the opposite of being detained. Robinson v. District of Columbia, 2006 WL 2714913, *9 (Sept. 22, 2006)(Lamberth, J.) ("The gist of any complaint for . . . false imprisonment is an unlawful detention"), quoting Marshall v. District of Columbia, 391 A.2d 1374, 1380 (D.C. 1978)(quoting Clarke v. District of Columbia, 311 A.2d 508, 511 (D.C. 1973)).

In his Opposition (p. 18, No. 3), Saha asserts that his "right to be in the classroom during 7:10pm-8:40pm was forcibly taken away" and that his right to "freedom of movement inside the classroom" and "outside the classroom in the hallway" was "taken away." In addition to the facts that he had no right to be inside the classroom or the hallway (because he was suspended) and that no force was used, these are allegations of an expulsion, not of detention. Elsewhere in his Opposition (at 21, 22, Saha Aff. # 1 at 47), Saha describes being "detained" in his office for 40 minutes on the morning of September 2. But the Incident Report reflects that he was observed

---

[2] Saha devotes pages 18-21 (and various scattered passages) of his false imprisonment argument to the events of the morning of September 2, 2005, when was escorted from his office, but his First Amended Complaint expressly references only his being asked to leave the classroom (on September 1) and makes no reference to events at his office on September 2. Even were this Court now to regard Saha's claim for false imprisonment to encompass the events of September 2, the result is the same.

3

entering the Department office at approximately 10:10am and being escorted out at 10:35am. Ex. 1 hereto. As for the 25 minutes he was present, the "Request for Security Services" reads:

> Police office [sic] to report to [Department] staff members Debby Swanson or Alison Mayhew. We request police officer to make sure that Prof. Saha does not create any problems with [Department] staff, faculty or students. **Prof. Saha may have access to his office (T-618), can stay there to complete his business and then [be] escorted off the Department premises.**

Ex. 2, page 3 hereto (emphasis added). Saha was not "detained;" he was being permitted to "complete his business" before being escorted out. Although Saha complains in a conclusory fashion of being "detained," he does not assert that he was actually prevented from leaving, or restrained in any fashion, or that he was not able to complete his office work.

B.     Saha Had No "Reasonable Apprehension of Present Confinement"

Not having been actually detained, Saha must show a "reasonable apprehension of present confinement" based upon "the actions or words of the defendant" and not the "subjective state of mind of the plaintiff." Dent v. May Dep't Stores Co., 459 A.2d 1042, 1044 (D.C. 1982). The actions of the University security officers remain undisputed. Saha was not arrested. Fact No. 13. He was not told he was under arrest; nor was he threatened with arrest if he refused to cooperate. Fact No. 13. The University security officers never touched Saha. Fact No. 14.

Saha's response is that, had he failed to cooperate, he believes these University security officers would have called the Metropolitan Police Department ("MPD"), and he believes the MPD would have arrested him because, according to what is apparently a copy of an April 1, 2004 article from the GW student newspaper (Saha's Exhibit 3; Opp. at 20), 11 protesting students who were occupying the Marvin Center had been arrested by the MPD for failing to comply with a University order to leave. But Saha's speculation that "if they arrested those students, they would have arrested me" is, among other things, an irrelevant expression of his "subjective statement of mind." Dent,

4

supra. Worrying that he might be arrested if he refused to leave the classroom (where he had no right to be) is not an objectively-justified "reasonable apprehension of present confinement."

### C. The University's Security Officers Acted Reasonably and In Good Faith (Initial Brief at 5-6)

University security officers acted reasonably and in good faith in escorting out an employee who had been suspended three days earlier and was "not to come to either campus to teach or perform any University responsibilities." Ex. A, Fact No. 2. Saha takes issue with the University's account of these episodes by arguing that there were three, not two, police officers in the elevator with him on September 2 (Saha Aff. # 1 at 47); that he was handed the bar notice (barring him from University property) by a different officer than identified by the University (Saha Aff. # 1 at 46); that he left the Gelman Library unaccompanied, not in the presence of Corporal Williams (Saha Aff. # 6 at 60); and that he did not park his car on the street, contrary to Corporal Williams' attestation that he watched Saha go to his car parked on the street. Saha Aff. # 6 at 60. None of these quibbles undercuts the reasonableness and good faith of these officers in escorting a suspended professor from University premises.

For these reasons, and for the reasons set forth in Defendants' Initial Brief, summary judgment on Count II in favor of Defendants against Saha is appropriate.

## II. SAHA HAS FAILED TO STATE A CLAIM FOR INVASION OF PRIVACY FOR FALSE LIGHT (Count III) (Initial Brief at 6-10)

Nothing in Saha's opposition (pp. 21-23) establishes any of the elements of a claim of invasion of privacy for false light.

5

A. There Was No "Publicity"

In between his rants,[3] Saha asserts that some un-named people allegedly saw him being escorted from the premises on September 1 and 2. Furthermore, Saha argues that there were more of these people present when he was being escorted out than Defendants have described. Opp. at 21, 22, Saha Aff. # 1 at 47. Even if so, Saha still does not satisfy the "publicity" element of a false light claim. As defined in Steinbuck v. Cutler, 2006 WL 3060084, *2 (D.D.C. 2006), "publicity" requires either that a matter be communicated to the public at large or that it be communicated to "so many persons that *the matter must be regarded as substantially certain to become one of public knowledge.*" Neither the September 1 nor the September 2 episode was "communicat[ed] to the public at large." Whatever number of people were present, they were not "so many persons that *the matter must be regarded as substantially certain to become one of public knowledge.*" More than two years have passed since these events. With hindsight, we know with certainty that escorting Saha from these premises never became a matter of "public knowledge." There was no article or picture in the student newspaper, or in any newspaper, and no press coverage of any kind. For a quick test, Googling "Saha" reveals no reference of any kind to these events.

Saha has produced no evidence that anyone knew anything about what was happening to him while it was happening, and no evidence that anyone learned about these events after they occurred. In its First Set of Interrogatories served April 9, 2007, Defendant The George Washington University specifically asked Saha (Interrogatory No. 7) to identify any persons who he contends saw him being escorted on September 1 or 2. Ex. 2. Saha failed to respond, and

---

[3] "Defendants... brought shame and disgrace to academia . . . through their corrupt academic practices and collective moral bankruptcy. . . .*Plaintiff respectfully requests the court to take a note of the extreme audacity on the part of the Defendants who were trusted with the moral bringing up of our children.*" Opp. at 21-22, emphasis in original.

accordingly is precluded from now introducing any such information, even if he had it.[4] See Fed. R. Civ. P. 37 (c)(1) ("If a party fails to provide information . . ., the party is not allowed to use that information . . . to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.")

**B.   There Was No "False Statement, Representation or Imputation"**

Although Saha asserts that he was the subject of "false representations" (Opp. at 22), he does not specify any such representation or how it was false. If escorting Saha from the classroom on September 1 and from the Departmental offices on September 2 implied anything negative about him, it was only that he was not permitted to be in those places. That implication was true, because he had been suspended on August 29. Fact Nos. 1, 2 and Ex. A ("You are not to come to either campus to teach or perform any University responsibilities.").[5] It is equally plausible that anyone who actually noticed Saha being escorted out might have inferred that he had sought the assistance of these security officers because, for example, he had been the victim of a crime or misconduct.

**C.   There Was No "Highly Offensive" False Light**

Objectively speaking, escorting a person whose suspension letter said "[y]ou are not to come to either campus to teach or perform any University responsibilities" from those premises, and doing so without incident, would not be "highly offensive to a reasonable person." Lane v. Random House, Inc., 985 F.Supp. 141, 148, 149 (D.D.C. 1995)(Lamberth, J.).

For these reasons, and for the reasons set forth in Defendants' Initial Brief, summary judgment on Count II in favor of Defendants against Saha is appropriate.

---

[4] Saha also failed to appear for his deposition that was noticed for Friday, May 11, 2007.

[5] Regardless of how many copies of the August 29 suspension letter he did not read, Saha indisputably knew of his suspension by the evening of September 1, when he was so advised by the University security officers. Undeterred, he went to his office the next morning as if nothing had happened the prior evening.

III.   **SAHA HAS FAILED TO STATE A CLAIM UNDER § 1983 (Count I)(Initial Brief at 10-11)**

Defendants already have established, and Saha's Opposition (pp. 16-17) does not refute, that Saha has failed to show that he was "deprived of a right secured by the Constitution or laws of the United States." Initial Brief at 10.

For these reasons, and for the reasons set forth in Defendants' Initial Brief, summary judgment on Count I in favor of Defendants against Saha is appropriate.

IV.   **SAHA HAS FAILED TO STATE A CLAIM FOR A DECLARATORY JUDGMENT (Count IV)(Initial Brief at 11-12)**

Saha's rambling diatribe (Opp. at 23-25) notwithstanding, the District of Columbia's three-year statute of limitations on claims for breach of contract has nothing whatsoever to do with the period of misconduct that the hearing panel was permitted to consider in Saha's tenure revocation proceeding. Initial Brief at 11-12.[6] Following Saha's filing of this count on January 5, 2007, the decision of the hearing panel was affirmed by an appeal panel, which led to the revocation of Saha's tenure and termination of his employment on March 1, 2007 – none of which is at issue in this lawsuit.

---

[6] Saha appears to assert that the University tried to bar introduction of older-than-three-years evidence at the revocation hearing. See, e.g., Opp. Brief at 25 ("The Defendants' plea in favor of **time-barring** allowable events and evidence in conducting the faculty proceedings were improper, and the Schaffner panel, by allowing such time-barring, acted improperly and **prejudiced the deliberation**.") (emphasis in original). To the contrary, the University repeatedly argued that its burden of proving Saha's "persistent neglect of professional responsibilities" enabled it to introduce all evidence of Saha's misconduct regardless of time period. Certainly Saha cannot have it both ways – arguing that the University should not have been able to introduce more-than-three-year-old evidence of his misconduct, but that he should have been permitted to introduce similarly-aged evidence of the University's supposed mistreatment of him. In the end, Saha's argument simply is legally incorrect, because the statute of limitations is a timeframe within which a lawsuit must be filed, and not a limitation on a university's right to explore misconduct by a faculty member.

CONCLUSION

For the foregoing reasons, and for the reasons set forth in Defendants' Initial Brief, summary judgment on all counts in favor of Defendants against Saha is appropriate.[7]

                                                                                                _/s/ Douglas B. Mishkin_

Douglas B. Mishkin, DC Bar # 338590
PATTON BOGGS LLP
2550 M Street, N.W.
Washington, D.C. 20037
Telephone: (202) 457-6000
Facsimile: (202) 457-6315
Counsel for Defendants

Dated: December 5, 2007

---

[7] In his Opposition at p. 65, Saha accuses undersigned counsel of falsifying (unspecified) evidence. For the record, undersigned counsel states that he did not falsify any evidence.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 5th day of December, 2007 a true and correct copy of the foregoing Reply in Support of Motion for Summary Judgment was sent by regular mail, postage prepaid to the following:

> Debabrata Saha
> 9409 Fairpine Lane
> Great Falls, VA  22066
>
> Plaintiff appearing *pro se*

_____
Douglas B. Mishkin